## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, <br><br> Plaintiffs, <br><br> v. <br><br><br> NOORUDDIN S. PUNJWANI, M.D.; PAIN ALLEVIATION & INTERVENTIONAL NEEDS, LLC n/k/a PAIN ALLEVIATION & INTERVENTIONAL NEEDS, PLLC; BARKETALI M. ROOPANI; ANIL B. ROOPANI; and SOHAIL B. ROOPANI; <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. <br><br><br> **PLAINTIFFS DEMAND TRIAL BY JURY** |

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm County Mutual Insurance Company of Texas ("State Farm County"), for their Complaint against Defendants Nooruddin S. Punjwani, M.D. ("Dr. Punjwani"); Pain Alleviation & Interventional Needs, LLC n/k/a Pain Alleviation & Interventional Needs, PLLC ("P.A.I.N."); Barketali M. Roopani; Anil B. Roopani; and Sohail B. Roopani (collectively, "Defendants"), allege as follows:

## I.     NATURE OF THE ACTION

1.     This action is brought by State Farm Mutual and State Farm County based upon hundreds of medical bills and supporting documentation that are fraudulent, which Dr. Punjwani and P.A.I.N. have knowingly submitted, and caused to be submitted, to State Farm Mutual and State Farm County for medically unnecessary evaluations, spinal injections, and related procedures, which were purportedly provided to individuals ("patients") who were involved in

motor vehicle accidents and asserted claims for damages against State Farm Mutual and State Farm County or individuals who were eligible for insurance benefits under State Farm Mutual and State Farm County policies.

2.     As discussed below, Dr. Punjwani falsely purports to legitimately examine patients reporting neck and/or back pain and prescribes the same type of spinal injections, namely a medically unnecessary series of three interlaminar epidural steroid injections ("ESIs"), for nearly all such patients and then purports to perform such injections on most patients without regard to whether they are needed.  (*See* Ex. 1.)

3.     The bills and supporting documentation Dr. Punjwani and P.A.I.N. submit, and cause to be submitted, to State Farm Mutual and State Farm County are fraudulent because:

a.     Dr. Punjwani does not perform legitimate examinations of the patients;

b.     patterns in the findings within Dr. Punjwani's initial examination reports are not credible and serve as pretext to support his predetermined recommendation for a series of three medically unnecessary ESIs for nearly all patients reporting neck and/or back pain (*see* Ex. 1);

c.     Dr. Punjwani interprets the MRI films for many of the patients and uses his purported findings as justification to support his predetermined and medically unnecessary ESI recommendations.  In fact, several MRI films read by Dr. Punjwani reveal that he has documented conditions that do not exist or exaggerated the severity of age-expected degenerative conditions that may exist, and he found that such conditions purportedly correlate with the patients' clinical symptoms, without explanation or regard to whether they do or not (*see* Exs. 1, 2);

d.     the ESIs that Dr. Punjwani recommends and purportedly performs are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' insurance claims;

e.     the medically unnecessary ESIs that Dr. Punjwani purportedly performs subject patients to undue and potentially serious risks by unnecessarily exposing them to injections in and around spinal structures, steroids, and radiation;

-2-

     f.      Dr. Punjwani's boilerplate operative reports for the ESIs that he purportedly performs are not credible based upon patterns in Dr. Punjwani's descriptions of the patients' diagnoses and their purported "significant improvement" as a result of the ESIs that are not credible (*see* Ex. 3); and

     g.      although Dr. Punjwani purportedly performs all ESIs using fluoroscopic guidance, for which P.A.I.N. charges $1,500, Dr. Punjwani and P.A.I.N. have represented in writing to State Farm Mutual and State Farm County that they do not keep any of the fluoroscopic images of the ESIs, which is (1) contrary to basic medical standards, (2) calls into question whether fluoroscopy was used, and (3) directly contradicts recent deposition testimony from Dr. Punjwani in which he admitted that P.A.I.N. saves fluoroscopy films electronically in patient charts.

4.     The fraudulent scheme is designed to enrich Defendants by exploiting two common claims scenarios, namely (a) bodily injury claims ("BI Claims") made by individuals not substantially at fault for automobile accidents to the insurance companies of the individuals who are substantially at fault for such accidents ("At-Fault Drivers"), in which they seek to recover economic losses (including past and future medical expenses) and non-economic losses (including pain and suffering); and (b) underinsured/uninsured motorist claims ("UM Claims") made by individuals to their own insurance companies if their recoveries under BI Claims from the At-Fault Drivers' insurance companies are insufficient to compensate the individuals for their economic and non-economic losses as a result of the accident.

5.     Under Texas law, insurers may be subject to substantial liability if they fail to accept "reasonable" settlement demands on BI Claims. Specifically, under the *Stowers* doctrine, if (1) an insurer for an At-Fault Driver fails to accept a reasonable settlement demand at or within policy limits in a short time frame, often 30 days or less, specified in the written demand from the injured party's personal injury attorney ("PI Attorney"), and (2) the At-Fault Driver incurs a judgment in excess of policy limits at trial, the insurer may be subject to liability for the

excess judgment.  *See G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. 1929).

6.     With respect to UM Claims, Texas law provides that an insurer likewise may be liable to its own insured for bad faith if it "fail[s] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear."  TEX. INS. CODE § 541.060(a)(2)(A); *see also* TEX. INS. CODE § 542.003.  If found liable for bad faith, an insurer may be responsible for its insured's compensatory damages, attorneys' fees, and potentially treble damages.  TEX. INS. CODE § 541.152.

7.     Dr. Punjwani and P.A.I.N.'s scheme is designed to enrich Defendants by inducing State Farm Mutual and State Farm County to (1) rely on their bills and supporting documentation that on their face purport to substantiate the need for, and often the performance of, one or more ESIs for nearly all patients reporting neck and/or back pain, and (2) settle BI and UM Claims within policy limits, and often for all or most of the limits, to protect State Farm Mutual, State Farm County, and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad-faith claims.

8.     To facilitate their scheme, Dr. Punjwani and/or P.A.I.N.: (a) prepare fraudulent examination reports to create the appearance patients suffered serious injuries that warrant the need for a series of three ESIs; (b) prepare fraudulent MRI interpretive reports documenting conditions that do not exist or are grossly exaggerated; (c) prepare fraudulent operative reports for the ESIs that Dr. Punjwani purportedly performs, diagnosing all patients with the same conditions; (d) prepare bills from P.A.I.N. with typical charges of $500 for Dr. Punjwani's examinations, $8,000 for each ESI that he purportedly performs, and $1,500 for the fluoroscopy

that he purportedly uses; and (e) provide these fraudulent documents and bills to the PI Attorneys representing the patients in BI Claims and UM Claims who, in turn, submit the bills and documentation to State Farm Mutual and State Farm County to support written demands to settle the claims within 30 days, and often within 14 days.  (*See* Ex. 4; ***see also*** Ex. 5, Demand Letter for Patient W.H. ("I additionally request that you advise your insured of the *Stowers* doctrine and its effect . . . . It is with these duties in mind that my client, [W.H.], demands the 'policy limits.'").)

9.     Dr. Punjwani and P.A.I.N.'s fraudulent bills and supporting documentation are designed to be and, in fact, have been substantial factors in inducing State Farm Mutual and State Farm County to settle the BI Claims and UM Claims at issue by causing them to make higher settlement offers than would be warranted without the fraudulent bills and supporting documentation from Dr. Punjwani and P.A.I.N.  (*See* Ex. 4.)  Absent Dr. Punjwani and P.A.I.N.'s fraudulent bills and supporting documentation, most of these claims would involve primarily chiropractic and/or physical therapy treatment for alleged soft tissue injuries with total medical expenses that would be significantly less than policy limits.  The fraudulent examination reports with recommendations for a series of three ESIs, and the performance of one or more medically unnecessary ESIs with corresponding charges of $9,500 per injection, cause the severity and potential value of the claims to be artificially inflated.

10.     State Farm Mutual and State Farm County have sustained damages of more than $3 million in settling the BI and UM Claims at issue.  Dr. Punjwani and P.A.I.N.'s fraudulent documentation and bills have been a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying more to settle these claims than they would have had

they known Dr. Punjwani and P.A.I.N.'s bills and supporting documentation were fraudulent. State Farm Mutual and State Farm County were the targets of Dr. Punjwani and P.A.I.N.'s scheme and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $3 million, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

11.    Dr. Punjwani and P.A.I.N.'s scheme began at least as early as August 2015, and it has continued uninterrupted since that time.

12.    State Farm Mutual and State Farm County bring this action asserting a statutory claim under 18 U.S.C. § 1962(c) ("RICO"), as well as a common law claim for money had and received, to recover actual damages in excess of $3 million, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme, plus treble damages and costs, including reasonable attorneys' fees.

## II.    JURISDICTION AND VENUE

13.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the RICO cause of action brought under 18 U.S.C. § 1961 *et seq.* because it arises under the laws of the United States.

14.    Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the money-had-and-received cause of action because it is so related to the RICO cause of action over which the Court has original jurisdiction that they form part of the same case or controversy.

15.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because Defendants reside here and a substantial part of the events or omissions that gave rise to the causes of action occurred here.

### III.   THE PARTIES

#### A.   **Plaintiffs**

16.     State Farm Mutual Automobile Insurance Company is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual is licensed and engaged in the business of insurance in Texas.

17.     State Farm County Mutual Insurance Company of Texas is a citizen of the state of Texas.  It is incorporated under the laws of the state of Texas, with its principal place of business in Dallas, Texas.  State Farm County is licensed and engaged in the business of insurance in Texas.

#### B.   **Defendants**

18.     Defendant Nooruddin Punjwani, M.D. resides in and is a citizen of the State of Texas.  Dr. Punjwani has been licensed to practice medicine in Texas since 2008.  According to his licensure information with the Texas Medical Board, Dr. Punjwani's principal practice areas are diagnostic radiology and musculoskeletal imaging.  Since January 2013, Dr. Punjwani has performed MRI and other diagnostic imaging reads for Elite Health Services, LLC ("Elite"), an MRI provider that shares some of the same locations as P.A.I.N. and which is owned and/or controlled by the same individuals who own and/or control P.A.I.N.  In an April 19, 2018 deposition, Dr. Punjwani testified that he holds the title of "VP of Clinical Services" at Elite. (Ex. 6, 4/19/18 Punjwani Tr. at 6.)   Starting in or about August 2015, immediately after P.A.I.N.'s formation, Dr. Punjwani began performing evaluations and injections at P.A.I.N, for which he is paid a fixed fee by P.A.I.N.'s owners for every evaluation and injection he performs. Since that time, Dr. Punjwani and P.A.I.N. have knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State

Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1, 2, 3, and 4.

19.     Defendant Pain Alleviation & Interventional Needs, LLC n/k/a Pain Alleviation & Interventional Needs, PLLC, was initially formed as a Texas limited liability company and is currently a Texas professional limited liability company.  P.A.I.N. was formed on or about July 8, 2015, with its registered office located at 3711 Garth Road, Suite 306, Baytown, Texas 77521. On information and belief, P.A.I.N.'s sole members from its formation through on or about June 29, 2018, were Barketali M. Roopani and two of his sons, Anil B. Roopani and Sohail B. Roopani, all of whom are laypersons who have resided in and are citizens of Texas.  On or about June 29, 2018, P.A.I.N. filed a Certificate of Amendment with the Texas Secretary of State changing its name to Pain Alleviation & Interventional Needs, PLLC, a professional limited liability company, and identifying Rahil B. Roopani, M.D. as its sole "manager."   On information and belief, Rahil B. Roopani, M.D., another son of Barketali M. Roopani, is currently the sole member of P.A.I.N. and resides in and is a citizen of Texas.  Accordingly, P.A.I.N. is and has been a citizen of Texas throughout its existence.  P.A.I.N. provides healthcare services at the following four locations:  (a) 19875 SW Freeway, Suite 100, Sugarland, Texas 77479; (b) 4001 W Sam Houston Pkwy N, Houston, Texas 77043; (c) 2416 W Holcombe, Houston, Texas 77030; and (d) 3711 Garth Road, Suite 160, Baytown, Texas 77521, the first three of which are also locations where Elite offers MRI services.  P.A.I.N. and Dr. Punjwani have knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1, 2, 3, and 4.

20.     Barketali M. Roopani resides in and is a citizen of the State of Texas.  He is a layperson and not licensed to practice medicine in Texas.  Barketali M.  Roopani is identified as a member of P.A.I.N. on the Texas Franchise Tax Public Information Report that P.A.I.N. filed with the Texas Secretary of State on January 31, 2018.  On information and belief, Barketali M. Roopani was a member of P.A.I.N. from its formation through on or about June 29, 2018.  As a member of P.A.I.N., Barketali M. Roopani has received a portion of the funds obtained through Dr. Punjwani and P.A.I.N.'s fraudulent scheme.

21.     Anil B. Roopani resides in and is a citizen of the State of Texas.  He is a layperson and not licensed to practice medicine in Texas.  Anil B. Roopani is identified as P.A.I.N.'s manager and registered agent on the Certificate of Amendment that P.A.I.N. filed with the Texas Secretary of State on January 23, 2016.  Dr. Punjwani has recently testified that Anil B. Roopani is an "owner" (i.e., member) of P.A.I.N.   On information and belief, Anil B. Roopani was a member of P.A.I.N. from its formation through on or about June 29, 2018.  As a member of P.A.I.N., Anil B. Roopani has received a portion of the funds obtained through Dr. Punjwani and P.A.I.N.'s fraudulent scheme.

22.     Sohail B. Roopani resides in and is a citizen of the State of Texas. He is a layperson and not licensed to practice medicine in Texas.  Dr. Punjwani has recently testified that Sohail B. Roopani is an "owner" (i.e., member) of P.A.I.N.   On information and belief, Sohail B. Roopani was a member of P.A.I.N. from its formation through on or about June 29, 2018.  As a member of P.A.I.N., Sohail B. Roopani has received a portion of the funds obtained through Dr. Punjwani and P.A.I.N.'s fraudulent scheme.

IV.     **ALLEGATIONS COMMON TO ALL COUNTS**

A.      **The Legitimate Diagnosis and Treatment of Neck and Back Pain**

23.     When a patient complains of neck and back pain following a motor vehicle accident, a licensed professional must obtain a detailed history and perform a legitimate examination to arrive at a proper diagnosis.   Based upon a legitimate diagnosis, a licensed professional must then engage in medical decision-making to design a legitimate treatment plan tailored to the unique needs of each patient.

24.     The decision of which, if any, types of treatment are appropriate for a patient, as well as the level, frequency, and duration of the various treatments should be individualized. This individualized decision must consider the patient's unique circumstances, including his or her (a) age; (b) social, family, and medical history; (c) physical condition, limitations, and abilities; (d) location, nature, and severity of the injury and symptoms; and (e) response to any previous treatment.

25.     Treatment plans should generally start with conservative care that is not invasive, such as anti-inflammatory medications, chiropractic care, and/or physical therapy, which may benefit patients by healing their injuries and relieving their symptoms with minimal associated risks and costs.  If patients' symptoms are not relieved through conservative care, other forms of treatment may be appropriate to relieve their symptoms, including various kinds of injections and other procedures designed to reduce pain and other symptoms caused by inflammation, irritation, or other conditions.   As with any other treatment option, whether to perform any kind of injection or other procedure should be tailored to the unique circumstances of each patient.

B.      **The Legitimate Use of ESIs and Other Common Spinal Injections**

26.     A provider may recommend and perform injections to treat pain in areas of the spine and to diagnose the source of the pain.  Because injections are invasive, expose patients to

ionizing radiation, often involve the injection of steroids into the body, and may involve the use of sedation, they present associated risks as well as increased costs to patients. Therefore, injections should be performed only when appropriate indications are present and they are medically necessary to diagnose and/or treat pain in and around the spine or other structures, to alleviate pain to facilitate conservative care, or to alleviate pain after conservative care has failed or is not an option. Three common types of spinal injections are ESIs, facet injections ("FIs"), and medial branch blocks ("MBBs").

27. The indications for ESIs are different than the indications for FIs and MBBs. The common clinical indication for ESIs is nerve-related pain radiating from the neck into the shoulders or arms or from the lower back into the buttocks or legs. By contrast, the common clinical indication for FIs and MBBs is chronic pain that is primarily concentrated in the back or neck (i.e., axial pain). As discussed below, in a legitimate pain management clinical setting, across a population consisting of hundreds of patients complaining of neck and/or back pain, one would expect a mixture of patients for whom (1) no spinal injections would be indicated, (2) ESIs would be indicated, (3) FIs would be indicated, (4) MBBs would be indicated, and (5) muscular injections, such as trigger point injections ("TPIs"), would be indicated. In other words, one would not expect to see injections indicated for virtually all patients with neck and/or back pain, nor would one expect to see ESIs indicated for virtually all such patients. (*See* Ex. 1.)

28. Moreover, there are three basic types of ESIs – interlaminar, caudal, and transforaminal injections – each of which may be performed to relieve a patient's symptoms by introducing steroid medications into the epidural spaces surrounding the vertebral levels at which the suspected pain-generating pathologies exist. An interlaminar ESI involves inserting a needle into the posterior epidural space between two adjacent vertebral lamina and delivering anesthetic

and steroids, which then typically spread to epidural spaces above and below the injected space. A caudal ESI involves inserting a needle through the sacral hiatus (a small boney opening just above the tailbone) to deliver anesthetic and steroids that typically spread to epidural spaces above the injected space.  A transforaminal ESI involves inserting a needle into the intervertebral neural foramen.  In a transforaminal ESI, the provider injects the anesthetic and steroid into the area referred to as the "nerve sleeve," which allows the steroid to travel up the sleeve and into a targeted epidural space.  Although there is an increased level of technical expertise required to perform transforaminal ESIs, this type of injection allows for greater precision in targeting the source of the patient's pathology, which results in a more concentrated delivery of the steroid into the affected area.  As discussed below, Dr. Punjwani exclusively recommends and purports to perform interlaminar ESIs, not caudal ESIs or the more targeted, skill-intensive approach of transforaminal ESIs.

29.     Prior to recommending and performing an ESI, a thorough physical examination involving several orthopedic, neurological, and other tests is required to evaluate for associated sensory, motor, or reflex deficits in the involved limb(s) to help guide treatment and establish a baseline status before initiating invasive treatment such as injections.  Normally, the clinical findings and indications are correlated with radiologic evidence (*e.g*., MRIs) of nerve-root irritation, inflammation, or compression at spinal levels that are consistent with the distribution of the patients' nerve-related pain and/or physical examination findings and that may be attributable to pathologies in and around the nerve roots.  As discussed below, Dr. Punjwani's initial exam reports reveal the same cursory examinations and result in recommendations that virtually all patients with neck and/or back pain receive interlaminar ESIs.  Moreover, for

virtually all such patients seen after December 2015, he recommends that they receive a series of three interlaminar ESIs.   (*See* Ex. 1, column Q.)

30.     A recommendation for a "series of three" ESIs is not medically necessary. According to guidelines published by the North American Spine Society, the American Academy of Physical Medicine and Rehabilitation, the American Academy of Pain Medicine, the Anesthesia Patient Safety Foundation, the American Society of Interventional Pain Physicians, and the Spine Intervention Society, a routine series of three injections, like those recommended by Dr. Punjwani for nearly all patients recommended ESIs, is never indicated. That is because patients should be examined and assessed after each ESI to determine if another injection is warranted.  A patient who receives minimal or no relief from an initial ESI is less likely to benefit from a second ESI.  Likewise, if a patient receives minimal or no relief from his or her first and second ESIs, it is even less likely that the patient will benefit from additional ESIs.  Therefore, based upon the very low likelihood of success after a failed ESI and the associated risks and costs, as a general matter, repeat ESIs should not be recommended without an interval assessment of the patient's response and unless the patient gets more than minimal relief from prior ESIs.

31.     The injections recommended and purportedly performed by Dr. Punjwani are predetermined and not medically necessary.  State Farm Mutual and State Farm County have thus far identified 868 P.A.I.N. patients with BI or UM Claims presented to State Farm Mutual or State Farm County from August 2015 to present, who complained of neck and/or back pain when they were purportedly examined by Dr. Punjwani.  (*See* Ex. 1.)   Dr. Punjwani recommended that 821 of those patients receive injections during their course of care at P.A.I.N., 803 of which received their injection recommendations from Dr. Punjwani on their first office

visit. Of those 821 patients that Dr. Punjwani recommended for injections, 810 were recommended to receive interlaminar ESIs, two were recommended to receive FIs, one was recommended to receive a TPI, eight were recommended only non-spinal injections (such as injections to the shoulder, knee or wrist), and none were recommended to receive MBBs, transforaminal ESIs, or caudal ESIs. Moreover, even the 47 patients who reported neck and/or back pain and did not receive an ESI recommendation from Dr. Punjwani nevertheless received the same cursory examinations with the same patterns in findings that are not credible. Indeed, of those 47 patients, seven were referred for an MRI by Dr. Punjwani and never returned to P.A.I.N., and most of the remaining 40 patients received a recommendation for future ESIs "if pain increases/recurs."

### 1. Fluoroscopic Guidance

32. To assist with needle placement, ESIs are typically performed under fluoroscopic guidance. Fluoroscopy is a radiological imaging technique used to obtain real-time images of the internal structures of a patient to help guide the path and proper placement of the needle during an injection. When fluoroscopic guidance is used, a physician inserts a needle into the targeted area, injects a contrast dye, and takes a picture using radiological imaging, which the physician uses to confirm that the needle is in the correct position. Once it is confirmed the needle is in the correct position, the injection of the medication can be performed.

33. Although P.A.I.N. charges $1,500 for fluoroscopic guidance purportedly performed with every ESI, Dr. Punjwani has refused multiple requests to provide any fluoroscopic films, stating in writing that: "As part of my regular course of business during an epidural steroid injection, I do not retain hard and or digital copies of fluoroscopic films of the intraoperative procedure." (Ex. 7, Punjwani Letter.) This statement, however, is contradicted by

Dr. Punjwani's April 19, 2018 deposition testimony, in which he admitted P.A.I.N. maintains fluoroscopic films electronically "[i]n the patient's chart on the software."  (Ex. 6, 4/19/18 Punjwani Tr. at 79.)  As discussed below, failing to maintain fluoroscopy films is contrary to basic medical standards and calls into question whether fluoroscopy was actually used during the ESIs and whether the ESIs were performed properly.  From a medical perspective, if fluoroscopy is used, the provider should maintain the films as the best evidence of the procedure that was performed in the event any questions arise regarding the procedure.  Conversely, there is no legitimate reason not to keep the films, given that the films cost almost nothing, do not require significant electronic storage space, and a hard copy of the film can easily be printed from most fluoroscopy machines by simply pushing a button.  Indeed, Dr. Punjwani has admitted that P.A.I.N. has the capability of saving fluoroscopy films and, in fact, it does so.

### 2.     Risks and Costs Associated with Spinal Injections

34.     Because ESIs entail the insertion of needles into areas in and around the spine, may be performed under fluoroscopic guidance, and typically include the use of steroids, these injections involve potentially serious risks and substantially increased costs for the patient. Therefore, ESIs should not be performed unless they are medically necessary, and if they are performed, attempts should be made to minimize the risks and costs.  The risks associated with these injection procedures include those associated with the patient's exposure to ionizing radiation from the use of fluoroscopy, the side effects and complications from steroids (*e.g.*, increased blood sugar, increased blood pressure, immunity reduction, adrenal suppression, psychosis, acute and chronic changes to the skin and bones such as fractures, avascular necrosis, and osteoporosis), and the direct procedure risks from the injection such as bleeding, infection, nerve injury, paralysis, and even death.  Moreover, the costs associated with injection procedures

can be substantial, as evident in P.A.I.N.'s typical charge, which is $9,500 per ESI visit.  (*See* Ex. 4.)

36. As discussed next, Dr. Punjwani did not perform legitimate exams or make legitimate findings.  Instead, despite the associated risks and costs, Dr. Punjwani's examinations were performed as a pretext to support his recommendation for a series of three interlaminar ESIs, and in many instances the purported performance of interlaminar ESIs.  This was done to substantially inflate the severity and potential value of BI and UM Claims to cause State Farm Mutual and State Farm County to settle those claims within policy limits, and often for all or most of those limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad-faith claims.

C.      **The Fraudulent Evaluations and Treatment Recommendations**

36. The scheme begins with Dr. Punjwani purporting to conduct initial evaluations that are cursory and serve as mere pretext for his recommendations of a series of three interlaminar ESIs for virtually every patient reporting neck and/or back pain.  During his initial evaluations, Dr. Punjwani purports to take the patients' history, perform physical exams, and arrive at treatment plans, all of which Dr. Punjwani documents in his initial examination reports ("Initial Exam Reports").

37. In at least one instance, it appears Dr. Punjwani prepared an Initial Exam Report for an examination that never occurred.  Specifically, Dr. Punjwani prepared an Initial Exam Report for patient B.H. dated April 21, 2017, which documents boilerplate and cursory findings and recommends that patient B.H. undergo a series of three lumbar ESIs. (Ex. 8, Initial Exam Report of Patient B.H.)  That report also expressly states that the "[p]rocedure was explained in detail of risks and benefits [*sic*]."  (*Id.* at 2.)  Contrary to this report, patient B.H. has testified under oath that he did not undergo a consultation at P.A.I.N. before receiving his injection. (Ex.

9, 5/18/18 Dep. Tr. of B.H. at 31.) Instead, he received a telephone call three weeks after undergoing an MRI at Elite, during which he was informed that "they were going to give [him] an injection." (*Id.*) Moreover, prior to receiving his ESI, no one at P.A.I.N. ever explained to him the risks of undergoing an ESI despite the express statement in his Initial Exam Report that such risks were "explained in detail." (*Id.*; *see* Ex. 8 at 2.)

### 1.    Fraudulent Exam Findings

38.    Dr. Punjwani's Initial Exam Reports do not reflect the patient's actual examination findings or a medically necessary treatment plan. Rather, they are boilerplate, include only scant details about the patients' condition, and reveal non-credible patterns. (*See* Ex. 1.) For instance, the Initial Exam Reports for virtually all patients contain nearly a full page of verbatim findings, including:  (a) a "Review of Systems" section, in which each patient purportedly reports that he or she has no issues or changes across nine different bodily systems, and (b) a "Physical Exam" section, in which Dr. Punjwani finds that each patient's HEENT (head, eyes, ears, nose, and throat), heart, lungs, abdomen, and extremities are all "[w]ithin normal limits." (*See* Ex. 1, columns J-K.) The uniformity of these findings across hundreds of patients is not credible and suggests that Dr. Punjwani does not legitimately examine or evaluate those areas.

39.    Based upon the risks and costs associated with spinal injections, patients' medical and treatment histories are important considerations in determining whether to recommend or perform injections. Among other things, physicians should consider the time and circumstances surrounding the onset of the patient's symptoms, the nature and duration of any treatment the patients have received, and the nature, level, and progress of the patients' responses to such treatment. Although most patients received some form of prior medical care before seeing Dr.

Punjwani, his Initial Exam Reports include only minimal (if any) discussion regarding the care provided or the patients' responses to the earlier treatment.  Moreover, there is no indication in his Initial Exam Reports that Dr. Punjwani ever attempted to obtain or review the records associated with the patients' prior treatment and factor them into his examinations or treatment plans.

40.     For example, Dr. Punjwani's Initial Exam Report for patient D.L. omits that the patient visited another pain management doctor two months earlier and had received lumbar FIs with favorable results.  (Ex. 10, Initial Exam Report and Prior Injection Records for Patient D.L., at 4, 7, 9, 10.)  In spite of this, and although patient D.L. responded favorably to prior FIs, Dr. Punjwani's Initial Exam Report makes no mention of D.L's earlier injections and recommends that he undergo a series of three lumbar ESIs.  (*See id.* at 2-3.)

41.     To the extent Dr. Punjwani ever references prior treatment – and he rarely does – his discussion is often limited to a single sentence or phrase.  For instance, Dr. Punjwani's entire discussion of prior treatment for patient P.P. reads as follows:  "[p]atient has been to physical therapy/chiro therapy for the past 8 difficulty [*sic*]."  (Ex. 11, Initial Exam Report for Patient P.P.; *see also* Ex. 12, Initial Exam Report for Patient Y.T. ("Patient went through physical therapy/ chiropractice [*sic*] for 4 months.")).  Dr. Punjwani failed to meaningfully document what specific treatment patient P.P. received from the physical therapist and/or chiropractor, the frequency of such treatment, and whether patient P.P. responded favorably to that treatment.  Similarly, in the very few instances where Dr. Punjwani does comment on the patient's response to prior therapy, his descriptions are not meaningful.  For example, Dr. Punjwani's only comment about patient B.M.'s prior treatment reads as follows:  "[p]atient reports positive response following therapy." (Ex. 13, Initial Exam Report for Patient B.M., at 1.)  Dr. Punjwani

provides no information regarding even which type of "therapy" patient B.M. received, how long she received it, and why she stopped. Moreover, despite her "positive response following therapy," Dr. Punjwani recommended that patient B.M. undergo a series of three lumbar ESIs and a series of three cervical ESIs. (*See id.* at 3.) Taken together, the absence of any documentation for most patients' prior treatment responses, plus the extremely limited descriptions of prior treatment for a handful of patients, demonstrate that Dr. Punjwani is not legitimately evaluating or considering patients' responses to prior treatment to develop an appropriate and individually tailored treatment plan.

42. Dr. Punjwani virtually always includes in his Initial Exam Reports a recommendation for his patients to receive a series of three interlaminar ESIs if (a) they complain of generalized neck and/or back pain, regardless of whether the pain radiates to the patients' limbs; and (b) their MRI reports document any disc herniation, protrusion, or bulge in their spine – findings for which Dr. Punjwani almost always includes a stock sentence that the MRI findings "correlate with clinical symptoms" – regardless of whether the location and severity of any pathologies correlate with the distribution of the patients' radiating pain.

43. Determining whether an ESI is indicated for any patient requires the performance of a legitimate examination, which Dr. Punjwani fails to do. For example, on his Initial Exam Reports, Dr. Punjwani's generalized findings of neck and/or back pain – which he documents as ranging from "residual" or "mild" to "severe" – are often inconsistent with the pain descriptions reflected in records from the patients' other providers. For instance, ten days prior to her initial visit to P.A.I.N., patient M.Z.'s chiro records reflected that she had a pain rating of only 2/10 with no radiating symptoms. (Ex. 14, Chiro Evaluation for Patient M.Z., at 1.) On patient M.Z.'s Initial Exam Report, however, Dr. Punjwani describes her as having "significant pain in

neck with radiculopathy into bilateral shoulders," which he apparently used as part of his justification to recommend and perform a cervical interlaminar ESI without detailing any incident during the intervening ten days to explain the change in patient M.Z.'s condition.  (Ex. 15, Initial Exam Report for Patient M.Z., at 1, 3.)  Dr. Punjwani even later recommended a second ESI for patient M.Z., but she did not return to receive the injection.  (*Id.* at 8.)  Similarly, on the day before his initial visit to P.A.I.N., patient E.H. reported to his chiropractor that he had "aching" pain throughout his neck and back, which he rated as only 3/10, and neither he nor his chiropractor reported any radiating symptoms.  (Ex. 16, Chiro Forms for Patient E.H.)  The next day, at P.A.I.N., Dr. Punjwani documented in his Initial Exam Report that patient E.H. was experiencing "significant lower back pain with radiculopathies in left lower extremities and neck pain."  (Ex. 17, Initial Exam Report for Patient E.H., at 1.)  Based on these findings and purported herniations and protrusions on E.H.'s MRI reports, Dr. Punjwani recommended that E.H. receive a series of three lumbar ESIs and a series of three cervical ESIs, even though patient E.H. was apparently experiencing relief from conservative care.  (*See id.* at 3.)  E.H. ultimately received one lumbar interlaminar ESI, and Dr. Punjwani prepared cost estimates totaling $49,500 for the remaining five injections without conducting any follow-up examination to evaluate patient E.H.'s response to the first ESI and determine whether future injections were appropriate.  (*See id.* at 4-7.)

44.      In addition, Dr. Punjwani rarely conducts any meaningful physical examination tests to evaluate the cause and extent of his patients' neck and/or back pain.  From August 2015 through in or about April 2018, Dr. Punjwani's Initial Exam Reports included a four-part "neurological exam," in which he rarely documented any specific neurological tests performed and presented only cursory findings – often three or four words per section – that may have been

gathered from patient interviews alone.  During this period, the "neurological exam" portion of

Dr. Punjwani's Initial Exam Reports included the following four sections:

<ol type="a" start="1">
</ol>

(a)   <u>"Sensory"</u>:   A section in which Dr. Punjwani purports to document whether the patient has any sensory deficits, but he provides only the generalized location(s) (e.g., "upper extremity") where the patient experiences numbness, tingling, tenderness and/or paresthesias without any meaningful specifics, which would be critical to diagnosing the cause of those symptoms and evaluating whether the patient suffers from any serious spinal conditions for which surgery may be warranted;

(b)   <u>"Motor"</u>:   A section in which Dr. Punjwani purports to document whether the patient has any motor strength deficits, but he provides only non-descript findings (usually only the patient's overall strength on a five-point scale) without specifying the specific muscles that are weak, which, like the sensory findings, would be critical to diagnosing the cause of those symptoms and evaluating whether the patient suffers from any serious spinal conditions for which surgery may be warranted;

(c)   <u>"Radiculopathy"</u>: A section in which Dr. Punjwani purports to document whether the patient has any radiculopathies – which is a diagnosis, not a physical examination finding – and occasionally documents the results of a straight leg raise ("SLR") test, but he provides only the generalized location(s) (e.g., "both legs") where the patient experiences radiating pain without specifying the specific areas of the affected limbs into which the pain radiates, which would be critical to determining whether the radiating pain correlates to any documented herniations, protrusions, bulges, or other pathologies in the spine; and

(d)   <u>"Pain"</u>:   A section in which Dr. Punjwani purports to document where the patient experiences any pain, but he provides only the generalized location(s) (e.g., back or neck) where the patient experiences pain, occasionally with a pain score.

(*See, e.g.,* Ex. 11, Initial Exam Report for Patient P.P., at 2.)  Nowhere in these four sections did

Dr. Punjwani document (a) any palpation tests, reflex tests, facet loading tests, or any other

orthopedic tests (such as Faber's and percussion tests for lumbar injuries and Spurling's test for

cervical injuries) other than the occasional SLR test, all of which are standard tests in a pain

management setting for a clinician to legitimately evaluate the injuries and other pathologies that

may be causing a patient's symptoms and to arrive at an appropriate treatment plan; (b) any

objective quantification of the severity of any finding (aside from an overall motor strength or pain score); (c) the specific muscle groups, nerves, and/or spinal levels impacted by the finding; or (d) how the finding impacts the patient's treatment. All of this information is necessary for a clinician such as Dr. Punjwani to legitimately examine the injuries and other pathologies that may be causing a patient's symptoms and to arrive at an appropriate treatment plan.

45.     Even the lone orthopedic test that Dr. Punjwani purportedly performed on occasion between August 2015 and April 2018 – the SLR test – is not documented in a meaningful manner. The SLR test is generally performed when a patient complains of pain that radiates into his or her lower extremities so that a medical provider can determine whether nerve root irritation is the cause of the patient's symptoms. The provider performs the test by having the patient lay on his or her back, and then lifting each of the patient's legs while his or her knee remains straight. If the patient experiences pain down a specific leg when it is lifted, then the SLR test is positive and indicates the presence of nerve root irritation in the lumbar spine, a condition often associated with a disc protrusion and/or a radiculopathy, which could be indications for an ESI. Importantly, when an SLR test is positive, the provider should record the affected leg and the angle (in degrees) at which the test elicited pain, as well as the nature, degree, and distribution of the pain to isolate the location and degree of the injury or condition contributing to the patient's symptoms, and to establish a baseline to assess the patient's progress, or lack thereof, over time. Although Dr. Punjwani frequently finds that the SLR test is positive in those instances he purports to conduct the test, he documents only the generalized location of the test result (e.g., "positive straight let raising test in bilateral legs").

46.     Beginning in or about April 2018, Dr. Punjwani began to add additional components to his purported "neurological exams," including "reflex tests" and sporadic,

additional orthopedic tests for certain patients (such as the cervical distraction test, shoulder depression test, Lasegue's test, and Bechterew's test).  (*See, e.g.,* Ex. 18, Initial Exam Report for Patient V.L.)  Like the SLR test, the results of these additional tests are not documented in any meaningful manner.  For instance, when tested, reflexes should be documented by muscle group and reflect a numerical result between 0 and 4+.  When Dr. Punjwani purports to conduct reflex testing, he provides only a limited description of the results, such as "normal" or "decrease in lower extremity," often without specifying a particular muscle group and he fails to ever provide a numerical result to assess any reflex deficits.  Likewise, when he documents additional orthopedic tests, which is rare, he provides only a minimal description of the test result (e.g., "positive" or "positive on the left") without specifying – as he should – the angle (in degrees) at which the test elicited pain, as well as the nature, degree, and distribution of the pain to isolate the location and degree of the injury or condition contributing to the patient's symptoms.  In short, as documented, none of the new tests in Dr. Punjwani's Initial Exam Reports after April 2018 have any clinical value.

47.     Regardless of the time period and content of Dr. Punjwani's purported "neurological exams," his cursory findings and documented test results have no impact on his predetermined treatment recommendations.  Indeed, regardless of whether reflexes are "normal" or "decreased" or specific tests are positive, negative, or documented at all, Dr. Punjwani virtually always concludes that each patient reporting neck and/or back pain requires a series of three interlaminar ESIs.  For instance, the neurological exam for patient P.P. purportedly yielded the following results:

**NEUROLOGICAL EXAM:**
SENSORY: No sensory deficit.  Neck tenderness
MOTOR: Limited range of motion.  Motor strength 5/5
RADICULOPATHY: None
PAIN : Neck

(Ex. 11, Initial Exam Report for Patient P.P., at 2.)  Despite documenting that patient P.P. had no radiculopathy or sensory deficit and had full motor strength, Dr. Punjwani nevertheless recommended that patient P.P. undergo a series of three cervical ESIs, based apparently on his "significant pain in the cervical spine" and findings of cervical herniations on his MRI report, which were not correlated to any relevant clinical information.  (*Id.* at 2-3.)  Likewise, Dr. Punjwani's neurological exam findings for patient I.Z. are as follows:

**NEUROLOGICAL EXAM:**
SENSORY: No sensory deficits
MOTOR: Motor strength 5/5
RADICULOPATHY: None
PAIN SCALE: 4/10 neck

(Ex. 19, Initial Exam Report for Patient I.Z., at 2.)  Like patient P.P., Dr. Punjwani recommended that patient I.Z. receive a series of three cervical ESIs, based apparently on neck pain and cervical disc herniations on her MRI report, which were not correlated to any relevant clinical information. (*See id.* at 2-3.)  As an additional example, Dr. Punjwani's Initial Exam Report for patient Z.E. makes no mention of radiating symptoms and indicates that Z.E.'s SLR test was negative.  (Ex. 20, Initial Exam Report for Patient Z.E., at 2.)  Despite these findings, which do not provide a justification for an ESI, Dr. Punjwani nevertheless recommended that Z.E. receive a series of three lumbar ESIs.  (*See id.* at 2-3.)  Dr. Punjwani's own documented findings for patients P.P., I.Z., and Z.E. do not justify his decision to recommend a single cervical ESI, much less a series of three.

48.     In at least one instance, Dr. Punjwani implemented his predetermined treatment recommendations even when his patient may have had a serious spinal injury in need of immediate surgical consultation.  In the MRI report for patient W.H.'s lumbar spine, the reading radiologist (someone other than Dr. Punjwani) found a 7 mm herniation at the L5-S1 spinal level

"causing significant mass effect on the cord and causing severe spinal canal stenosis." (Ex. 21, Lumbar MRI Report for Patient W.H.)  Due to the size and placement of the herniation, the radiologist specifically noted in his MRI report that a "[n]eurosurgical consultation [was] recommended."  In Dr. Punjwani's Initial Exam Report, he reports the following findings for patient W.H.'s neurological exam:

> NEUROLOGICAL EXAM:
> SENSORY: tenderness in neck and lower back
> MOTOR: 3-4/5 in bilateral legs
> RADICULOPATHY: bilateral hips, and negative straight leg raising test in bilateral legs.
> PAIN : neck pain and lower back pain

(Ex. 22, Initial Exam Report for Patient W.H.)  Despite finding a severe motor strength deficit (3-4/5 in both legs), a radiculopathy affecting both hips, and acknowledging the radiologist's recommendation for a surgical consultation, Dr. Punjwani nevertheless recommended that patient W.H. receive a series of three lumbar interlaminar ESIs and a series of three cervical interlaminar ESIs, of which she received one lumbar interlaminar ESI.  (*See id.* at 2-3.)  Dr. Punjwani never referred patient W.H. to a surgeon to evaluate her potentially serious spinal condition, subjecting her to undue and serious risk.

49.     Remarkably, after documenting his cursory and non-credible findings for each patient, Dr. Punjwani does not even document any diagnoses for patients in his Initial Exam Reports.  Instead, as explained below, Dr. Punjwani only documents diagnoses in his operative reports for those patients who return to P.A.I.N. to receive their recommended injections, which remarkably include the same diagnoses of spondylosis and stenosis for all patients.

### 2.     Fraudulent MRI Findings

50.     Dr. Punjwani's Initial Exam Reports next contain a section devoted to imaging findings.  In that section, Dr. Punjwani (a) repeats the principal findings from the patients' MRI

reports, including most notably the existence of any herniations, protrusions, or bulges; (b) provides a minimal description of the patients' purported condition; and (c) for virtually all patients, includes a stock sentence that the MRI findings "correlate with clinical symptoms" without any explanation or documentation.  (*See* Ex. 1, columns L-M.)  For instance, in the Initial Exam Report for patient P.P., after listing several herniation findings in his cervical spine from patient P.P.'s MRI report (from a radiologist other than Dr. Punjwani), Dr. Punjwani provides only the following discussion for patient P.P.'s condition:

> 57-year-old with no significant medical history involved in a MVA and reports cervical spine pain. Neurological exam demonstrated tenderness and decreased range of motion. Recent MRI findings report disc herniations at several levels. Findings correlate with clinical symptoms.

(Ex. 11, Initial Exam Report for Patient P.P.)  Similarly, after listing two protrusions on patient I.Z.'s cervical spine from her MRI report that Dr. Punjwani himself prepared, he offers only the following discussion:

> 44 year old female patient with no significant medical history was involved in a recent MVA and reports significant neck pain. Recent MRI findings report 3 mm disc protrusion compromising the ventral thecal sac at multiple levels in mid and lower cervical spine. Findings correlate with clinical symptoms.

(Ex. 19, Initial Exam Report for Patient I.Z.)  For the vast majority of patients, including patients P.P. and I.Z., Dr. Punjwani specifically concludes that the MRI findings "correlate with [the patients'] clinical symptoms" without any meaningful discussion regarding how the MRI findings correlate to the patients' clinical symptoms, such as drawing a connection between a specific symptom and a specific spinal abnormality.  In fact, State Farm Mutual and State Farm County are not aware of any instance in which Dr. Punjwani documented the MRI findings did *not* correlate with the patient's symptoms, even though the vast majority of the MRI findings appear to reflect age-expected degenerative changes.  His routine finding of the purported

"correlat[ion]" between clinical symptoms and imaging results is not credible and is made to support his medically unnecessary ESI recommendations for virtually all patients.

51.     Moreover, approximately half of P.A.I.N.'s patients underwent MRIs at Elite, the MRI facility that shares some of the same owners and office locations as P.A.I.N.  Dr. Punjwani personally interpreted and prepared reports for many of those MRIs.   In fact, in a recent deposition, Dr. Punjwani testified that he reviews and prepares reports for approximately 30-70 MRI and other imaging films per day at Elite.  (Ex. 6, 4/19/18 Punjwani Tr. at 15-16.)   As evident in the chart attached hereto as Ex. 2, Dr. Punjwani consistently reports non-credible findings in his MRI reports.  For instance, (a) for every single P.A.I.N. patient for whom Dr. Punjwani interpreted his or her spinal MRI films, he made a positive finding of disc pathology in at least one spinal region; and (b) on virtually every MRI report reflecting a positive finding, he found that the specific type of disc pathology was a herniation and/or protrusion, and not a less-serious finding of a bulge.  (*See* Ex. 2.)  Dr. Punjwani's routine MRI findings across hundreds of patients are not credible.

52.     For the patients for whom State Farm Mutual and State Farm County have obtained actual MRI films, it is apparent that Dr. Punjwani prepared MRI reports reflecting findings of abnormalities that did not exist or findings that exaggerated the severity of abnormalities to support medically unnecessary ESI recommendations.   For instance, Dr. Punjwani's report for patient A.D., a 40-year-old male, reflects two herniations in the cervical spine, one measuring 3.6 mm at C5-C6 and one measuring 5 mm at C6-C7.  (*See* Ex. 23, Cervical MRI Report for Patient A.D..)  The MRI film of patient A.D.'s cervical spine, however, reveals only degenerative changes and no herniations whatsoever.  Likewise, Dr. Punjwani's report for patient R.Q., a 38-year-old male, reflects three herniations:  a 3.7 mm herniation at L2-

L3, a 3 mm herniation at L4-L5, and a 6.5 mm herniation at L5-S1.  (*See* Ex. 24, Lumbar MRI

Report for Patient R.Q.)  The MRI film for patient R.Q.'s lumbar spine, however, reveals only

minimal degenerative changes at L2-L3, a perfectly clean disc at L4-L5, and generalized bulging

at L5-S1.  Additionally, Punjwani's MRI report for patient T.L.'s lumbar spine reveals three disc

abnormalities:  a "protrusion/herniation" measuring 6 mm at L3-L4, a "protrusion/bulge"

measuring 5 mm at L4-L5, and a "protrusion/bulge" measuring 3 mm at L5-S1.  (Ex. 25, Lumbar

MRI Report for Patient T.L.)  The MRI film for patient T.L.'s lumbar spine, however, reveals

perfectly clean discs at L4-L5 and L5-S1 and a protrusion at L3-L4 with mild foraminal

narrowing.  Dr. Punjwani uses these embellished and, at times, fabricated findings to support his

future recommendations for a series of three medically unnecessary ESIs for virtually all

patients.

53.     In addition to supporting injection recommendations, Dr. Punjwani's fraudulent

MRI reads also serve to bolster demand packages for PI Attorneys.  Specifically, PI Attorneys

often use Dr. Punjwani's MRI findings in their demand letters to support the purported severity

of the patient's condition and the need for extensive treatment, including ESIs, and substantial

associated charges.  For instance, the demand letter submitted by the attorney for patient T.M.

touted her large herniation findings from Dr. Punjwani as follows:

During the course of ▮▮▮▮ treatment, Dr. Marullo referred her to Elite Health Services for a lumbar
and right hip MRI which revealed the following positive findings:

**LUMBAR MRI**

o   At L4-5 level, posterior central and bilateral posterolateral broad-based disc
    herniations are seen measuring **3 mm in thickness** resulting in bilateral foraminal
    narrowing with impingement of L4 nerve roots bilaterally.

o   At L5-S1 level, posterior central and bilateral posterolateral broad-based disc
    herniations are seen measuring **5 mm in thickness** resulting in bilateral foraminal
    narrowing with impingement of L5 nerve roots bilaterally.

(Ex. 26, Demand Letter for Patient T.M. (emphasis in original), at 2.)  Based on these findings and the patient's current and future treatment costs, including most notably $10,300 in bills from P.A.I.N. for an examination and ESI and $20,600 for two future ESIs from P.A.I.N., patient T.M.'s attorney demanded full policy limits ($30,000) from State Farm County and provided only 14 days to respond.  (*See id.* at 4-5.)  In so doing, the attorney also specifically threatened State Farm with the possibility of liability for an excess verdict under *Stowers*.  (*See id.* at 3.) State Farm County ultimately agreed to settle patient T.M.'s claim for $24,100.

### 3.   Fraudulent Treatment Recommendations

54.   Based upon Dr. Punjwani's fraudulent Initial Exam Reports of patient complaints and findings, he subjects virtually all patients with neck and/or back pain to predetermined injection recommendations, which are not tailored to the unique needs of any patient, not altered based upon previous treatments by other providers, not altered due to changes in the patients' conditions, and subject patients to substantial undue risks and costs.  Dr. Punjwani has a significant financial incentive to prescribe and perform injections on P.A.I.N. patients because he is paid a fixed fee per injection.

55.   Of the 813 P.A.I.N. patients at issue who received a recommendation for a spinal injection from Dr. Punjwani, 810 were recommended to receive interlaminar ESIs, two were recommended to receive FIs, one was recommended to receive a TPI, and none were recommended to receive MBBs, transforaminal ESIs, or caudal ESIs.  (*See* Ex. 1.)  As described above, FIs and MBBs are also common types of spinal injections and they have different indications than ESIs.  Across hundreds of patients in a pain management clinical setting, one would expect to see significant variation in the types of procedures recommended and performed, if any.

56. Dr. Punjwani recommended FIs to only *two* patients out of the 813 patients who received a spinal injection recommendation. Both patients – E.E. and I.P. – were involved in the same accident and were evaluated by Dr. Punjwani on the same day. Moreover, both patients had already underwent MRIs from a facility other than Elite and received a report from a radiologist other than Dr. Punjwani that made no findings of any disc pathologies (i.e., herniations, bulges, or protrusions). Faced with MRI reads finding no disc pathology, which Dr. Punjwani could not embellish or fabricate on his own, he recommended and purported to perform FIs on both patients. (*See* Ex. 27, P.A.I.N. Documentation for Patient I.P.; Ex. 28, P.A.I.N. Documentation for Patient E.E.) Notably, P.A.I.N.'s bill for patient E.E. incorrectly represents that he received an interlaminar ESI. (*See* Ex. 28 at 8.)

57. As reflected in the chart attached hereto as Ex. 1, for nearly all patients reporting back and/or neck pain, Dr. Punjwani recommends ESIs to one or more spinal regions, and for nearly all patients he evaluated after December 2015, he recommends a series of three ESIs. As described above, peer-reviewed medical literature and professional medical society guidelines establish that there is no legitimate basis to recommend and perform a series of three injections, let alone uniformly do so. Instead, patients should be examined and assessed after each injection to determine if another injection is warranted. Moreover, as further evident in the chart attached hereto as Ex. 1, Dr. Punjwani has, over time, significantly increased the frequency with which he recommends that patients receive injections in multiple regions, either in multiple areas of the spine (e.g., cervical and lumbar) or in a spinal region and a joint (e.g., cervical and shoulder). There is no credible medical basis for this trend.

D. **The Fraudulent Operative Reports**

58. For those patients who appear for and receive one or more of their recommended ESIs, Dr. Punjwani and occasionally other physicians prepare one-page operative reports

("Operative Reports") for the procedures, which Dr. Punjwani and P.A.I.N. submit, and cause to be submitted, along with the Initial Exam Reports and bills, to State Farm Mutual and State Farm County.  Like his Initial Exam Reports, Dr. Punjwani's Operative Reports are boilerplate and not credible.

59.     Dr. Punjwani uses nearly identical Operative Reports for all patients upon whom he performs ESIs.  (Ex. 29, Sample Operative Reports.)  In the Operative Reports, Dr. Punjwani makes predetermined diagnoses of spondylosis and stenosis for all patients.  (*See* Ex. 3, columns J-K.)  Spondylosis and stenosis, in particular, are non-specific conditions, and taken together without any corresponding radicular symptoms, as is the case for many of Dr. Punjwani's patients, they are not indications for ESIs.  For some patients, Dr. Punjwani includes vague diagnoses of (a) "radiculopathy" without specifying the affected nerve root(s) (e.g., "left C5 radiculopathy") and/or (b) "numbness/tingling" without describing the onset, frequency, severity and location of that symptom to arrive at a possible diagnosis of the condition(s) causing the patients' "numbness/tingling."  Moreover, even if Dr. Punjwani receives additional information concerning a patient's condition, he fails to correlate his initial diagnosis to that additional information or arrive at a more specific diagnosis.

60.     Although Dr. Punjwani's Operative Reports document the use of fluoroscopic guidance on all ESI procedures and P.A.I.N. bills $1,500 for that procedure, Dr. Punjwani and P.A.I.N. have represented in writing that they maintain no evidence of the purported fluoroscopic imaging.  Specifically, Dr. Punjwani has submitted correspondence to State Farm Mutual and State Farm County in which he states:  "As part of my regular course of business during an epidural steroid injection, I do not retain hard and or digital copies of fluoroscopic films of the intraoperative procedure.  The use of fluoroscopy is strictly used for guidance and placement

during the procedure itself." (Ex. 7.)  This purported practice, which Dr. Punjwani himself has contradicted in sworn deposition testimony (Ex. 6, 4/19/18 Punjwani Tr. at 79), is contrary to basic medical standards and calls into question whether he is, in fact, using fluoroscopic guidance for his ESI procedures.   Doctors performing spinal injections should maintain fluoroscopy films, including images from different angles from each procedure as a matter of course for several reasons, including to (1) preserve visual evidence of the location of an injection in the event the patient later encounters complications or additional injections in the same area are warranted, and (2) demonstrate to third-party payors, such as State Farm Mutual and State Farm County, that the procedure occurred as indicated.

61.    Furthermore, Dr. Punjwani documents in every Operative Report that each ESI was immediately successful with no difficulties.  Indeed, for every patient who supposedly received an ESI, Dr. Punjwani documented that:  (1) he or she "reported significant improvement in pain symptoms"; (2) "no complications were noted during or immediately after the procedure"; (3) he or she "did not report any aggravation of pain after procedure"; and (4) that a neurological exam or "quick neuro exam" after the procedure reported normal functioning.  (Ex. 3, columns L-O.)  As an initial matter, it is not credible that, across hundreds of patients with different spinal structures and mechanisms of injury, Dr. Punjwani encountered no complications.   It is also not credible that patients experienced immediate "significant improvement in pain symptoms."   To determine whether an ESI has led to "significant improvement," the steroids used in ESIs typically require at least a full day to provide pain relief and thus the only relief that could have been experienced by patients during or immediately after ESIs would be from the numbing agent (lidocaine) applied to the injection site.  By documenting

that every patient experiences "significant improvement in pain systems," Dr. Punjwani creates the false impression that every such procedure was successful.

62.     Multiple patients have provided sworn testimony that expressly contradicts the details documented in the Operative Reports.  For instance, patient M.S. testified she experienced pain and dizziness during the performance of her ESI.  (Ex. 30, Patient M.S. Recorded Statement, at 22.)  Despite this testimony, Dr. Punjwani's Operative Report for patient M.S. reports the same four observations that every other patient received, including that there was "no complications were noted during or immediately after the procedure."  (Ex. 31, Operative Report for Patient M.S.)  As another example, patient C.B. testified that her ESI caused "horrible pain" after her ESI.  (Ex. 32, Patient C.B. Recorded Statement, at 29.)  Contrary to this testimony, Dr. Punjwani's Operative Report for patient C.B. made the same four observations as patient M.S.'s report, including that C.B. encountered "no complications" and "reported significant improvement of pain symptoms."  (Ex. 33, Operative Report for Patient C.B.)

E.     **All of the Above Procedures Were Recommended and Performed to Support Fraudulent Charges.**

63.     The purported services inflated the value of BI and UM Claims submitted to State Farm Mutual and State Farm County, causing State Farm Mutual and State Farm County to settle BI and UM Claims that otherwise might not have been settled or pay substantially more to settle the claims, from which Defendants received payment from the PI Attorneys.  (*See* Ex. 4.)

64.     From approximately August 2015 through approximately March 2017, P.A.I.N. typically generated two charges each time Dr. Punjwani performed an ESI – $8,000 for the ESI itself (CPT Codes 62310 or 62311) and $1,500 for fluoroscopic guidance (CPT Code 77003), for which Dr. Punjwani and P.A.I.N. maintain no fluoroscopic films.  Starting in or about March

2017, after a change in Centers for Medicare & Medicaid Services (CMS) billing guidelines, P.A.I.N. simply combined the fluoroscopy charge with the ESI charge for each procedure and began to bill $9,500 in a single charge under new billing codes (CPT Codes 62321 or 62323).

65.    P.A.I.N.'s charges are grossly excessive.  By way of reference, P.A.I.N.'s charges are several thousand percent higher than the corresponding reimbursement rates paid by Medicare to providers in the Houston area over the relevant periods, as demonstrated in the following charts:

### 2015-2016 CHARGES

| Procedure (CPT Code) | P.A.I.N.'s Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62310) | $8,000.00 | $247.33 | 3,134% |
| Interlaminar ESI – Lumbar/Sacral (62311) | $8,000.00 | $228.10 | 3,407% |
| Fluoroscopic Guidance (77003) | $1,500.00 | $87.01 | 1,624% |

### 2017 CHARGES

| Procedure (CPT Code) | P.A.I.N.'s Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62321), Including Fluoroscopic Guidance | $9,500.00 | $255.88 | 3,613% |
| Interlaminar ESI – Lumbar/Sacral (62323), Including Fluoroscopic Guidance | $9,500.00 | $251.21 | 3,682% |

66.    P.A.I.N.'s grossly excessive charges inflate the value of BI and UM Claims by increasing the medical expenses allegedly incurred, or which may be incurred, by the patients as

a result of their accidents.  These charges induce State Farm Mutual and State Farm County to settle those claims within policy limits, and often at or near policy limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad-faith claims.

F.     **State Farm Mutual and State Farm County's Injuries Are Directly Related to and a Natural Consequence of Dr. Punjwani and P.A.I.N.'s Fraudulent Scheme**

67.     Dr. Punjwani and P.A.I.N. are obligated legally and ethically to act honestly and with integrity.  Yet Dr. Punjwani and P.A.I.N. have submitted, and caused to be submitted, to State Farm Mutual and State Farm County bills and documentation that are fraudulent in that they represent the underlying services were actually rendered and were medically necessary when they were not.

68.     The object of Dr. Punjwani and P.A.I.N.'s scheme is to enrich Defendants by causing State Farm Mutual and State Farm County to rely on their fraudulent documentation and bills, thereby incurring damages by agreeing to settle BI and UM Claims that otherwise might not have been settled, or by paying more to settle BI and UM Claims than they would have had they known that Dr. Punjwani and P.A.I.N.'s bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of Dr. Punjwani and P.A.I.N.'s scheme, and the damages incurred by State Farm Mutual and State Farm County were the direct result and natural consequence of Dr. Punjwani and P.A.I.N.'s scheme.

69.     State Farm Mutual and State Farm County have been damaged more than $3 million in settling the BI and UM Claims at issue.  Dr. Punjwani and P.A.I.N.'s fraudulent documentation and bills were a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying more to settle these claims than they would have had they known

the bills and supporting documentation were fraudulent.  As a result, State Farm Mutual and State Farm County are entitled to more than $3 million in damages, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

## V.     CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF 18 U.S.C. §1962(c)**
**(Against Defendant Nooruddin S. Punjwani, M.D.)**

70.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 69 above.

71.     P.A.I.N. has been a limited liability company (and is currently a professional limited liability company) and an "enterprise" (the "P.A.I.N. Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

72.     Defendant Dr. Punjwani is and has been employed by and/or associated with the P.A.I.N. Enterprise.

73.     Since at least August 2015 and continuing uninterrupted to the present, Dr. Punjwani has knowingly conducted and/or participated, directly or indirectly, in the conduct of the P.A.I.N. Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud State Farm Mutual and State Farm County by submitting and causing to be submitted fraudulent bills and supporting documentation for evaluations and injections which either were not performed, were not legitimately performed, or were not medically necessary, which in turn caused settlement checks to be deposited in the U.S. mails by State Farm Mutual and State Farm County and delivered on or about the dates reflected on Ex. 4.

74.     Specifically, the bills and supporting documentation that Dr. Punjwani submits,

and causes to be submitted, for these services through P.A.I.N. are fraudulent because:

a.     Dr. Punjwani does not perform legitimate examinations of the patients;

b.     patterns in the findings within Dr. Punjwani's Initial Exam Reports are not credible and serve as pretext to support his predetermined recommendation for a series of three medically unnecessary ESIs for nearly all patients reporting neck and/or back pain (*see* Ex. 1);

c.     Dr. Punjwani interprets the MRI films for many of the patients and uses his purported findings as justification to support his predetermined and medically unnecessary ESI recommendations.  In fact, several MRI films read by Dr. Punjwani reveal that he has documented conditions that do not exist or exaggerated the severity of age-expected degenerative conditions that may exist, and he found that such conditions purportedly correlate with the patients' clinical symptoms, without explanation or regard to whether they do or not (*see* Exs. 1, 2);

d.     the ESIs that Dr. Punjwani recommends and purportedly performs are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' insurance claims;

e.     the medically unnecessary ESIs that Dr. Punjwani purportedly performs subject patients to undue and potentially serious risks by unnecessarily exposing them to injections in and around spinal structures, steroids, and radiation;

f.     Dr. Punjwani's boilerplate Operative Reports for the ESIs that he purportedly performs are not credible based upon patterns in Dr. Punjwani's descriptions of the patients' diagnoses and their purported "significant improvement" as a result of the ESIs that are not credible (*see* Ex. 3); and

g.     although Dr. Punjwani purportedly performs all ESIs using fluoroscopic guidance, for which P.A.I.N. charges $1,500, Dr. Punjwani and P.A.I.N. have represented in writing to State Farm Mutual and State Farm County that they do not keep any of the fluoroscopic images of the ESIs, which is (1) contrary to basic medical standards, (2) calls into question whether fluoroscopy was used, and (3) directly contradicts recent deposition testimony from Dr. Punjwani in which he admitted that P.A.I.N. saves fluoroscopy films electronically in patient charts.

75.     The bills and corresponding mailings, which comprise the pattern of racketeering activity identified through the date of this Complaint, are described in part in Exs. 1, 2, 3, and 4, attached hereto.   Representative samples of these bills and supporting documentation are attached as Exs. 8, 10-13, 15, 17-20, 22-25, 27-29, 31, and 33.

76.     State Farm Mutual and State Farm County have been injured in their business and property by reason of the above-described conduct in excess of $3 million.   The fraudulent documentation and bills Dr. Punjwani submits, and causes to be submitted, through P.A.I.N. are at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims that they otherwise might not have settled, and pay more to settle BI and UM Claims than they would have paid had they known that the bills and supporting documentation were fraudulent.   State Farm Mutual and State Farm County were the intended targets of the scheme, and their damages are directly related to and a natural consequence of the scheme.   As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $3 million, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendant Nooruddin S. Punjwani, M.D. for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### MONEY HAD AND RECEIVED
### (Against All Defendants)

77.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 69 above.

78.     State Farm Mutual and State Farm County conferred a benefit upon Defendants by paying more than $13 million to settle the BI and UM Claims at issue, and Dr. Punjwani and P.A.I.N.'s fraudulent bills and supporting documentation were at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims that they otherwise might not have settled, and by paying more to settle BI and UM Claims than they would have had they known that the bills and documentation were fraudulent.

79.     The money that Defendants obtained in connection with the BI and UM Claims at issue in equity and good conscience belongs to and should be returned to State Farm Mutual and State Farm County.

80.     Defendants are in a unique position to know the amount of money they received from the more than $11.4 million that State Farm Mutual has paid and the more than $2.1 million State Farm County has paid to settle the BI and UM Claims at issue.  State Farm Mutual and State Farm County are not currently aware of the precise amount of money Defendants received. However, based upon the substantial amount of P.A.I.N.'s charges in the BI and UM Claims at issue –  more than $5.5 million – State Farm Mutual and State Farm County allege, on information and belief, that the amounts received by Defendants are substantial.

81.     Because Dr. Punjwani and P.A.I.N.'s services were not performed, not legitimately performed, or not medically necessary, they had no value.  Therefore, in equity and good conscience, Defendants should be required to pay restitution to State Farm Mutual and State Farm County in an amount equal to the total amounts they received as a result of the more than $13 million that State Farm Mutual and State Farm County have collectively paid to settle the BI and UM Claims at issue.

82.     Based upon Dr. Punjwani and P.A.I.N.'s material misrepresentations and other affirmative acts to conceal their conduct from State Farm Mutual and State Farm County, their injuries were inherently undiscoverable.  Despite State Farm Mutual and State Farm County's diligence in uncovering the injurious conduct, State Farm Mutual and State Farm County did not discover and should not have reasonably discovered that its damages were attributable to Dr. Punjwani and P.A.I.N.'s conduct until May 2017, at the earliest.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants for the above-described damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm County demand a trial by jury.

Dated this 23rd day of April, 2019.

By:  */s/  Ross O. Silverman*

Ross O. Silverman
(*admission pro hac vice pending*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
P:  (312) 902-5200
F:  (312) 577-8989
ross.silverman@kattenlaw.com

ATTORNEY-IN-CHARGE FOR
PLAINTIFFS STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY and STATE FARM
COUNTY MUTUAL INSURANCE
COMPANY OF TEXAS

Of Counsel:

Brian Antweil (S.D. Tex. No. 12482)
Emily Rochy (S.D. Tex. No. 1358194)
Katten Muchin Rosenman LLP
1301 McKinney Street, Suite 3000
Houston, TX 77010-3033
(713) 270-3402
brian.antweil@kattenlaw.com
emily.rochy@kattenlaw.com

Jared T. Heck
(*admission pro hac vice pending*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
jared.heck@kattenlaw.com