# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 4:19-cv-01491 |
| | ) ) | Hon. Ewing Werlein, Jr |
| NOORUDDIN S. PUNJWANI, M.D.; PAIN ALLEVIATION & INTERVENTIONAL NEEDS, LLC n/k/a PAIN ALLEVIATION & INTERVENTIONAL NEEDS, PLLC; BARKETALI M. ROOPANI; ANIL B. ROOPANI; and SOHAIL B. ROOPANI; | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' COMBINED RESPONSE BRIEF IN
## OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS (DKT. NOS. 14, 15)

## TABLE OF CONTENTS

I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............. 1

II.   STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............. 1

III.   SHORT SUMMARY OF ARGUMENT ................................................................ 3

IV.   FACTUAL BACKGROUND ............................................................................... 3

V.   ARGUMENT ........................................................................................................ 10

    A.   The Complaint Pleads Its Fraud Allegations with Particularity. .................. 10

        1.   The Complaint's Detailed Description of the Fraudulent Scheme and Supporting Appendices Satisfy Rule 9(b). ............................................. 10

        2.   The Complaint Adequately Alleges That Dr. Punjwani Intended to Defraud Plaintiffs. .................................................................................. 15

    B.   The Complaint Alleges Violations of the Mail Fraud Statute and a Valid RICO Enterprise. ........................................................................................... 16

        1.   The Complaint Alleges Violations of the Mail Fraud Statute. ............ 17

        2.   The Complaint Alleges a Valid RICO Enterprise. ............................... 18

    C.   The Complaint States a Claim for Money Had and Received Against All Defendants. ..................................................................................................... 19

        1.   The Complaint Adequately Alleges the Money Paid by Plaintiffs to Settle BI and UM Claims Rightfully Belongs to Plaintiffs. ................. 20

        2.   The Complaint Adequately Alleges That Defendants Received Money That in Equity and Good Conscience Belongs to Plaintiffs. ............... 22

        3.   The Roopani Defendants' Reliance on the Texas Business Organizations Code is Misplaced Because the Complaint Alleges They Personally Received Money. ................................................................. 25

VI.   CONCLUSION ................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Nissan N. Am., Inc.*,
No. 4:17-CV-2653, 2018 WL 2338871 (S.D. Tex. May 4, 2018)...........................................24

*Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*,
No. CV H-12-1206, 2016 WL 7496743 (S.D. Tex. Dec. 31, 2016)........................................21

*Aetna Life Ins. Co. v. Won Yi*,
No. CV H-14-900, 2019 WL 2355543 (S.D. Tex. June 3, 2019)............................................21

*Allstate Ins. Co. v. Benhamou*,
190 F. Supp. 3d 631 (S.D. Tex. 2016) ............................................................................ *passim*

*Allstate Ins. Co. v. Donovan*,
No. CIV.A. H-12-0432, 2012 WL 2577546 (S.D. Tex. July 3, 2012) ....................................14

*Allstate Ins. Co. v. Lyons*,
843 F. Supp. 2d 358 (E.D.N.Y. 2012) ....................................................................................15

*Allstate Ins. Co. v. Plambeck*,
802 F.3d 665 (5th Cir. 2015) ..................................................................................................15

*Allstate Ins. Co. v. Utica Physical Therapy, Inc.*,
No. 17-cv-13823, 2018 WL 3037885 (E.D. Mich. June 19, 2018) .........................................13

*Ashe v. Corley*,
992 F.2d 540 (5th Cir. 1993) ..................................................................................................16

*B Choice Ltd. v. Epicentre Dev. Assocs. LLC*,
No. 14-2096, 2016 WL 3911123 (S.D. Tex. May 12, 2016)....................................................19

*Bank of Saipan v. CNG Fin. Corp.*,
380 F.3d 836 (5th Cir. 2004) ..............................................................................................20, 22

*Bonner v. Henderson*,
147 F.3d 457 (5th Cir. 1998) ..................................................................................................18

*Breslin Realty Dev. Corp. v. Schackner*,
397 F. Supp. 2d 390 (E.D.N.Y. 2005) ....................................................................................17

*In re Burzynski*,
989 F.2d 733 (5th Cir. 1993) ..................................................................................................17

*Everett v. TK-Taito, L.L.C.*,
178 S.W.3d 844 (Tex. App. 2005).........................................................................24

*GE Capital Commercial, Inc. v. Wright & Wright, Inc.*,
No. 309-CV-572, 2009 WL 5173954 (N.D. Tex. Dec. 31, 2009)...........................22

*H.E.B., LLC v. Ardinger*,
369 S.W.3d 496 (Tex. Ct. App. 2012)................................................................3, 20

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*,
879 F. Supp. 2d 243 (E.D.N.Y. 2012)..............................................................13, 15

*Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Texas*,
No. 11-2086, 2012 WL 3028107 (S.D. Tex. July 24, 2012).......................20, 21, 25

*Phoenix Bond & Indem. Co. v. Bridge*,
553 U.S. 639 (2008)...........................................................................................2, 17

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)................................................................................................19

*S.E.C. v. Sharp Capital, Inc.*,
No. 98-CV-2792G, 1999 WL 242691 (N.D. Tex. Apr. 16, 1999).....................2, 10

*Scanlan v. Texas A & M Univ.*,
343 F.3d 533 (5th Cir. 2003).....................................................................................1

*Schmuck v. United States*,
489 U.S. 705 (1989)..........................................................................................17, 18

*Segner v. Sinclair Oil & Gas Co.*,
No. 3-11-CV-03606, 2012 WL 12885055 (N.D. Tex. June 4, 2012).....................24

*State Farm Mut. Auto. Ins. Co. v. Advanced Chiropractic and Med. Center Corp.*,
No. 18-CV-21127, Dkt. No. 38 (S.D. Fla. Mar. 15, 2019).....................................13

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
No. 04-CV-5045, 2008 WL 4146190 (E.D.N.Y. Sept. 5, 2008)............................13

*State Farm Mut. Auto. Ins. Co. v. Elite Health Ctrs., Inc.*,
No. 16-cv-13040, 2017 WL 877396 (E.D. Mich. Mar. 6, 2017)......................13, 22

*State Farm Mut. Auto. Ins. Co. v. Kugler*,
No. 11-cv-80051, 2011 WL 4389915 (S.D. Fla. Sept. 21, 2011).....................13, 23

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*,
427 F. App'x. 714 (11th Cir. 2011)........................................................................22

iv

*State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*,
    107 F. Supp. 3d 772 (E.D. Mich. 2015)............................................................13, 19

*State Farm Mut. Auto. Ins. Co. v. Radden*,
    2015 WL 631965 (E.D. Mich. Feb. 13, 2015) ........................................................13

*State Farm Mut. Auto Ins. Co. v. Universal Health Grp., Inc.*,
    No. 14-cv-10266, 2014 WL 5427170 (E.D. Mich. Oct. 24, 2014)..........................13

*State Farm Mut. Auto. Ins. Co. v. Vital Cmty. Care, P.C.*,
    No. CV 17-11721, 2018 WL 2194019 (E.D. Mich. May 14, 2018).........................13

*State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*,
    No. 14-cv-11521, 2015 WL 4724829 (E.D. Mich. Aug. 10, 2015)..........................13

*TCI Cablevision of Dallas, Inc. v. Owens*,
    8 S.W.3d 837 (Tex. Ct. App. 2000) .........................................................................21

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) ...................................................................................14

*Tri-State Chemicals, Inc. v. W. Organics, Inc.*,
    83 S.W.3d 189 (Tex. Ct. App. 2002) .......................................................................22

*United Food & Commercial Workers Unions & Employers Midwest Health
Benefits Fund v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) ...................................................................................19

*United States v. Plato*,
    593 F. App'x 364 (5th Cir. 2015) ............................................................................16

*United States v. Surtain*,
    519 F. App'x 266 (5th Cir. 2013) ............................................................................18

*United States v. Traxler*,
    764 F.3d 486 (5th Cir. 2014) ...................................................................................17

**Statutes**

18 U.S.C. § 1961(4) .......................................................................................................2, 18

18 U.S.C. § 1964(c) ...........................................................................................................16

Tex. Bus. Orgs. Code. Ann 21.223(a)(2).........................................................................25

**Other Authorities**

Federal Rules of Civil Procedure 8(a) ..............................................................................13

Federal Rules of Civil Procedure 9(b) ................................................................ *passim*

Federal Rules of Civil Procedure 12(b)(6)................................................................1, 2

## I.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm County Mutual Insurance Company of Texas ("State Farm County") (collectively, "Plaintiffs") filed their Complaint on April 23, 2019 (Dkt. No. 1), alleging that Defendants Nooruddin S. Punjwani, M.D. ("Dr. Punjwani") and Pain Alleviation & Interventional Needs, LLC n/k/a Pain Alleviation & Interventional Needs, PLLC ("P.A.I.N.") engaged in a comprehensive scheme to defraud Plaintiffs through the submission of hundreds of fraudulent medical bills and supporting documentation for medically unnecessary evaluations, spinal injections, and related services.  The Complaint asserts two causes of action: (1) a statutory claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Dr. Punjwani and (2) a common law claim for money had and received under Texas law against five defendants, namely Dr. Punjwani, P.A.I.N., and P.A.I.N.'s three owners – Barketali M. Roopani, Anil B. Roopani, and Sohail B. Roopani (collectively, the "Roopani Defendants") – all of whom received proceeds from the scheme.

On July 19, 2019, Defendants collectively filed two Motions to Dismiss, one filed by Dr. Punjwani individually (Dkt. No. 14) and one filed by P.A.I.N. and the Roopani Defendants (Dkt. No. 15).  As described below, both Motions should be denied in their entirety.

## II.     STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Defendants contend that both causes of action in the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6).  In evaluating the Motions, the Court must accept as true all well-pleaded facts in the complaint and view the allegations as a whole in the light most favorable to the non-movant.  *See Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  Importantly, the Fifth Circuit has "consistently disfavored dismissal under Rule

12(b)(6)." *Id*.  A complaint should only be dismissed if it fails to include allegations "that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 642 (S.D. Tex. 2016).

In their Motions, Defendants collectively raise three issues with respect to the Complaint. First, Dr. Punjwani asserts that the Complaint fails to satisfy Rule 9(b) pleading requirements as to the RICO claim, and all five Defendants argue that Rule 9(b) requirements are not met for the money-had-and-received claim. (Dkt. No. 14, at 7-9; Dkt. No. 15, at 9.)  Rule 9(b) requires plaintiffs to "plead the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benhamou*, 190 F. Supp. 3d at 642-43.  "The purpose of Rule 9(b) is to facilitate a defendant's ability to respond to and prepare a defense to a charge of fraud."  *S.E.C. v. Sharp Capital, Inc.*, No. 98-CV-2792G, 1999 WL 242691, at *1 (N.D. Tex. Apr. 16, 1999).

Second, Dr. Punjwani argues that Plaintiffs have failed to satisfy only the "racketeering activity" (i.e., mail fraud) and "enterprise" elements of their RICO claim.  (Dkt. No. 14 at 9-11) A mail fraud violation requires proof of two elements: (1) a scheme to defraud, and (2) any "mailing that is incident to an essential part of the scheme. . . . even if the mailing itself contain[s] no false information."  *See Phoenix Bond & Indem. Co. v. Bridge*, 553 U.S. 639, 647 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 713 (1989)).  Further, RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Stated differently, "a RICO enterprise can be either a legal entity or an association-in-fact."  *Benhamou*, 190 F. Supp. 3d at 648.

2

Third, Defendants argue that Plaintiffs have failed to state claim for money had and received under Texas law because, among other reasons, Plaintiffs did not make payments directly to Defendants.  (Dkt. No. 14 at 11-12, Dkt. No. 15 at 7-8.)  To assert a money-had-and-received claim, a plaintiff need only allege that the defendant holds money which in equity and good conscience belongs to the plaintiff.  *H.E.B., LLC v. Ardinger*, 369 S.W.3d 496, 507 (Tex. Ct. App. 2012).

## III.   SHORT SUMMARY OF ARGUMENT

Defendants' arguments in favor of dismissal are meritless.  As an initial matter, the Complaint's detailed factual allegations and supporting appendices easily satisfy Rule 9(b) pleading requirements, as evident in the numerous cases across the country in which similar complaints withstood Rule 9(b) challenges, all of which have been ignored by Defendants.  Next, Dr. Punjwani's RICO arguments rest upon a misreading of the Complaint and a misunderstanding of black-letter RICO authority.  Plaintiffs have alleged numerous predicate acts of mail fraud over the course of years and the existence of a valid "legal entity" enterprise, in addition to all of the other elements of a civil RICO claim (which Defendants concede). Finally, all arguments raised by Defendants regarding the money-had-and-received claim overstate the law and pleading requirements for that cause of action.  Plaintiffs have sufficiently alleged that all Defendants hold money which in equity and good conscience belongs to Plaintiffs, namely the proceeds of the alleged fraud scheme.  Both Motions to Dismiss should be denied in their entirety.

## IV.   FACTUAL BACKGROUND

The Complaint details a comprehensive scheme to defraud State Farm Mutual and State Farm County through Dr. Punjwani and P.A.I.N.'s preparation and submission of hundreds of

medical bills and supporting documentation that are fraudulent.  (Dkt. No. 1 at ¶ 1.)  Further, the Complaint attaches several detailed appendices specifically identifying the fraudulent claims at issue.  (*Id.* at Exs. 1-4.)  The scheme begins with Dr. Punjwani purporting to conduct legitimate examinations of auto accident victims ("patients"), but his purported examinations are nothing more than pretext to support his predetermined recommendation that all P.A.I.N. patients reporting neck and/or back pain receive a medically unnecessary series of three interlaminar epidural steroid injections ("ESIs.").  (*Id.* ¶ 2.)  Dr. Punjwani then purports to perform one or more ESIs on most patients, and Dr. Punjwani and P.A.I.N. prepare bills with exorbitant charges of $9,500 for each ESI procedure.  (*Id.* ¶¶ 2, 8.)  The fraudulent bills and supporting documentation are designed to curry favor with personal injury attorneys ("PI Attorneys") representing the patients in bodily injury claims ("BI Claims") and underinsured/uninsured motorist claims ("UM Claims"), who use the bills and documentation to demand that insurers like State Farm Mutual and State Farm County settle the patients' claims at or near policy limits. Dr. Punjwani and P.A.I.N.'s fraudulent bills and supporting documentation have been substantial factors in inducing Plaintiffs to make higher settlement offers and, in turn, causing them to settle BI and UM Claims that otherwise might not have been settled or pay more to settle the claims than they would have paid absent the fraudulent bills and supporting documentation.  (*Id.* ¶¶ 9, 10, 67-69.)  The scheme ultimately enriches Defendants, who receive a portion of the settlement proceeds from the PI Attorneys.  (*Id.* ¶ 63.)

The fraud scheme begins with Dr. Punjwani's fraudulent initial evaluations, during which he purports to determine the patients' medical and treatment histories, perform physical exams, and arrive at treatment plans, all of which he documents in initial examination reports ("Initial Exam Reports").  (Dkt. No. 1 at ¶ 36.)  Exhibit 1 of the Complaint identifies each fraudulent

Initial Exam Report generated by Dr. Punjwani on a patient-by-patient basis and describes his non-credible findings and fraudulent injection recommendations.  (*Id.* at Ex. 1.)  Rather than conduct legitimate evaluations to properly gauge the medical necessity of injections or other treatment, Dr. Punjwani's evaluations are cursory and serve as mere pretext for his predetermined recommendations for a series of three interlaminar ESIs.[1]  (*Id.* ¶¶ 36, 47.)  Among other issues, Dr. Punjwani's Initial Exam Reports include only scant details about the patients' conditions, and in many cases, contain findings that are inconsistent with contemporaneous records from the patients' other providers.  (*Id.* ¶ 43.)  Moreover, Dr. Punjwani rarely conducts any meaningful orthopedic tests to evaluate the cause and extent of his patients' neck and/or back pain.  (*Id.*  ¶¶ 44, 47.)  And even when he does, the results of the documented test results have no impact on his predetermined treatment recommendations.  (*Id.* ¶ 47.)

The Initial Exam Reports also contain a section devoted to imaging findings. Dr. Punjwani's purported analysis of the patients' MRI findings is not legitimate.  As an initial matter, approximately half of P.A.I.N.'s patients underwent MRIs at Elite Health Services, LLC ("Elite"), an MRI facility that shares some of the same owners and office locations as P.A.I.N., and Dr. Punjwani personally interpreted and prepared reports for many of those MRIs.  (Dkt. No. 1 at ¶ 51.)  As detailed in Exhibit 2 to the Complaint, Dr. Punjwani consistently reports non-credible findings in his MRI reports.  (*Id.* at Ex. 2.)  For instance, (a) for every P.A.I.N. patient for whom Dr. Punjwani interpreted his or her spinal MRI films, he made a positive finding of disc pathology in at least one spinal region; and (b) on virtually every MRI report reflecting a positive finding, he found that the specific type of disc pathology was a herniation and/or protrusion, and not a less-serious finding of a bulge.  (*Id.* ¶ 51.)  These routine positive findings,

---

[1]   In fact, in at least one instance, Dr. Punjwani's prepared an Initial Exam Report for an examination that did not even occur.  (*See id.* at ¶ 37.)

which Dr. Punjwani uses as a basis to recommend ESIs and PI Attorneys use to demonstrate the purported severity of their clients' conditions, are not credible and are fraudulent.  (*Id*. ¶ 53.) Additionally, the Complaint identifies several specific instances in which Dr. Punjwani prepared MRI reports reflecting (1) findings of abnormalities that did not exist on the films and/or (2) findings that exaggerated the severity of abnormalities that may have existed on the films, in order to support medically unnecessary ESI recommendations.  (*Id.* ¶ 52.)  Further, for virtually all patients, including those for whom he did not conduct a fraudulent MRI read, Dr. Punjwani includes a stock sentence in his Initial Exam Reports concluding that the patient's MRI findings "correlate with clinical symptoms," without any explanation or documentation, to suggest an ESI is medically necessary.  (*Id*. at Ex. 1, columns L-M.)  In fact, Plaintiffs are not aware of any instance in which Dr. Punjwani documented that the MRI findings did not correlate with the patient's symptoms, even though the majority of the MRI findings appear to reflect age-expected degenerative changes.  (*Id*. ¶ 50.)

Virtually all of Dr. Punjwani's Initial Exam Reports conclude with a predetermined recommendation that each patient reporting neck and/or back pain should receive a series of three interlaminar ESIs regardless of the patient's history, physical exam findings, or response to prior treatment.  (*Id*. ¶¶ 36, 47, 54-57.)  Of the 813 patients at issue that Dr. Punjwani recommended for spinal injections, 810 (i.e. 99%) were recommended to receive interlaminar ESIs.  (*Id*. ¶ 55.)  In a legitimate pain management clinical setting across a population of hundreds of patients complaining of neck and/or back pain, one would expect a mixture of patients for whom (1) no spinal injections would be indicated, (2) ESIs would be indicated, (3) other common spinal injections such as facet injections or medial branch blocks would be indicated, and (4) muscular injections, such as trigger point injections, would be indicated.  (*Id.*

¶ 27.)   Stated differently, one would not expect to see injections indicated for virtually all patients with neck and/or back pain, nor would one expect to see the same type of injection indicated for virtually all such patients.   (*Id.*)   Not only are Dr. Punjwani's predetermined recommendations medically unnecessary, but they expose his patients to significant risks, such as bleeding, infection, nerve injury, paralysis, and even death.   (*Id.* ¶ 34.)

Additionally, an initial recommendation for a "series of three" ESIs is never medically necessary.   (*Id.* ¶ 30 (referring to the multiple professional society guidelines).)   That is because patients should be examined and assessed after each ESI to determine if another injection is warranted.   (*Id.*)   A patient who receives minimal or no relief from an initial ESI is less likely to benefit from a second ESI.   (*Id.*)   Likewise, if a patient receives minimal or no relief from his or her first and second ESIs, it is even less likely that the patient will benefit from more ESIs.   (*Id.*)

Based on the recommendations in the fraudulent Initial Exam Reports, Dr. Punjwani (and occasionally other physicians at P.A.I.N.) then purport to provide one or more of the recommended ESIs.   For each ESI procedure, Dr. Punjwani and P.A.I.N. generate a one-page operative report ("Operative Report"), which, like the Initial Exam Reports, is boilerplate and contains patterns that are not credible.   For example, for all of the patients receiving injections, Dr. Punjwani documents identical diagnoses of spondylosis and stenosis.   (Dkt. No. 1 at ¶ 59.) Further, Dr. Punjwani documents in every patient's Operative Report that:   (1) he or she "reported significant improvement in pain symptoms"; (2) "no complications were noted during or immediately after the procedure"; (3) he or she "did not report any aggravation of pain after procedure"; and (4) his or her neurological exam or "quick neuro exam" after the procedure reported normal functioning.   (*See id.* ¶ 61; *see also id.* at Ex. 3, columns L-O.)   These reported findings are not credible across hundreds of patients with different spinal structures and

mechanisms of injury.  Indeed, the Complaint identifies at least two P.A.I.N. patients who have testified that they experienced complications from their ESI procedure, but Dr. Punjwani's Operative Reports nevertheless document that they encountered "no complications" and "reported significant improvement of pain symptoms."  (*Id.* ¶ 62.)  Moreover, it is not credible that all patients immediately improved from the ESIs because the steroids used in ESIs typically require at least a full day to provide pain relief.  (*Id.* ¶ 61.)  Finally, each Operative Report documents that the ESI was performed under fluoroscopic guidance – for which P.A.I.N. routinely charges $1,500 per procedure – but P.A.I.N. and Dr. Punjwani have represented to Plaintiffs that they do not maintain the fluoroscopic films for the procedures, which is contrary to the standard of care and calls into question whether fluoroscopic guidance was used.  (*Id.* ¶ 60.) Exhibit 3 to the Complaint identifies and describes each fraudulent Operative Report on a patient-by-patient basis.

After generating the fraudulent documentation described above, Dr. Punjwani and P.A.I.N. send these materials with the accompanying bills to PI Attorneys to be included in demand packages the PI Attorneys submit to Plaintiffs and other insurers.  (Dkt. No. 1 at ¶ 8.)  PI Attorneys use the fraudulent bills and supporting documentation from P.A.I.N. to support their time-sensitive written demands that Plaintiffs settle the claims at or near policy limits.  (*Id.* ¶ 8.) Crucial to this effort is P.A.I.N.'s grossly excessive charges for its ESI procedures.  Specifically, P.A.I.N. charges $9,500 for each ESI procedure, which is a more than 3,000% mark up from the Medicare reimbursement rate.  (*Id.* ¶ 65.)  These excessive charges inflate the value of BI and UM Claims by increasing the medical expenses allegedly incurred as a result of the patients' accidents.  (*Id.* ¶ 66.)  By artificially inflating the value of the BI and UM Claims in this manner, Dr. Punjwani and P.A.I.N. are able to maintain: (1) their referral relationships with PI Attorneys

8

and (2) their revenue stream, because they receive payment from the settlement proceeds from PI Attorneys.  (*Id.* ¶¶ 7, 9-10.)  Exhibit 4 identifies in detail each demand package containing Dr. Punjwani and P.A.I.N.'s fraudulent bills and supporting documentation, including the date of the demand, the amount of P.A.I.N.'s charges, and, for the paid claims at issue, the amount paid to settle the claim and the dates Plaintiffs mailed out settlement checks.  (*Id.* at Ex. 4.)

Dr. Punjwani and P.A.I.N.'s fraudulent documentation and bills were a substantial factor and, in fact, have caused Plaintiffs to make higher settlement offers and ultimately agree to settle claims that otherwise might not have been settled, or pay more to settle claims than they would have had they known the bills and supporting documentation were fraudulent.[2]  (Dkt. No. 1 at ¶ 9.)  Absent the fraudulent, excessive bills and supporting documentation, most of the BI and UM Claims at issue would involve primarily chiropractic and/or physical therapy treatment for alleged soft tissue injuries with total medical expenses that would be significantly less than policy limits.  (*Id.*)  Dr. Punjwani and P.A.I.N.'s fraudulent bills and supporting documentation, however, induced Plaintiffs to settle the claims often at or near policy limits to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad-faith claims.  (*Id.* ¶ 66.)

State Farm Mutual and State Farm County have sustained damages of more than $3 million in settling the BI and UM Claims at issue.   Plaintiffs seek recovery of that sum or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually

---

[2]  Defendants argue that Plaintiffs somehow "fail[ed] to act in good faith toward [their] insureds" by settling the claims at issue.  (Dkt. No. 14 at 3; Dkt. No. 15 at 1.)  This argument is belied by the well-pleaded factual allegations in the Complaint.  Plaintiffs settled the BI and UM Claims at issue in good faith but were ultimately the victims of a fraud scheme driven by Dr. Punjwani and P.A.I.N.

received as a result of the scheme.[3]   (Dkt. No. 1 at ¶¶ 10, 12.)   Defendants are in a unique position to know the amount of money they received from the more than $11.4 million that State Farm Mutual has paid and the more than $2.1 million State Farm County has paid to settle the BI and UM Claims at issue.   (*Id.* ¶ 80.)   However, based upon the substantial amount of P.A.I.N.'s charges in the BI and UM Claims at issue – more than $5.5 million – Plaintiffs allege, on information and belief, that the amounts received by Defendants are substantial.   (*Id.*)

## V.   ARGUMENT

### A.   The Complaint Pleads Its Fraud Allegations with Particularity.

Defendants raise two Rule 9(b) arguments with respect to both causes of action in the Complaint.   First, they contend that the Complaint does not allege that any of the services at issue were fraudulent and also that it fails to describe the time, place and contents of the fraudulent misrepresentations.   (Dkt. No. 14 at 6-8.)   Second, Dr. Punjwani argues that the Complaint fails to allege that he had the specific intent to commit fraud for purposes of the RICO count.   (*Id.* at 8-9.)   As detailed below, Defendants' arguments should be rejected.

#### 1.   The Complaint's Detailed Description of the Fraudulent Scheme and Supporting Appendices Satisfy Rule 9(b).

Rule 9(b) requires plaintiffs to "plead the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."   *Benhamou*, 190 F. Supp. 3d at 642-43.   Importantly, however, "[t]he purpose of Rule 9(b) is to facilitate a defendant's ability to respond to and prepare a defense to a charge of fraud."   *Sharp Capital*, 1999 WL 242691, at *1.   Moreover, "when certain information

---

[3] Contrary to Dr. Punjwani's bare assertion, Plaintiffs are not seeking recovery of any sums they paid as a result of "final judgments after trials on the merits."   (*See* Dkt. No. 14 at 3.)

is peculiarly within defendants' knowledge, the courts are more forgiving in applying Rule 9(b), finding that less detail is required in such cases." *Benhamou*, 190 F. Supp. 3d at 642–43.

Defendants' generalized Rule 9(b) arguments ignore the detailed Complaint allegations describing the fraud scheme perpetrated by Dr. Punjwani and P.A.I.N., as well as the Complaint's appendices detailing, on a patient-by-patient basis, the fraudulent documentation supporting the scheme.  First, as detailed directly above (*see* pp. 4-10 *supra*), Plaintiffs have alleged a comprehensive scheme in which all of the purported treatment was fraudulent because Dr. Punjwani's evaluations were not legitimate and served as pretext to support his predetermined recommendation for a medically unnecessary series of three interlaminar ESIs. Then, most P.A.I.N. patients underwent one or more of their recommended injections, for which P.A.I.N. and Dr. Punjwani generated grossly excessive bills of $9,500 per injection to inflate the value of BI and UM Claims in order to curry favor with PI Attorneys and enrich Defendants, without regard to whether the procedures were medically necessary.

Second, contrary to Defendants' bare assertions (*see* Dkt. No. 14 at 5-7), the Complaint specifically describes the misrepresentations at issue in this case.  Dr. Punjwani and P.A.I.N. designed and submitted bills and supporting documentation falsely representing that, among other things: (1) Dr. Punjwani performed legitimate examinations of the patients when, in fact, these examinations served as pretext to support his predetermined recommendation for a series of three medically unnecessary ESIs for nearly all patients reporting neck and/or back pain; (2) Dr. Punjwani performed legitimate interpretations of MRI films when, in fact, his purported findings are non-credible, fraudulent, and, in many cases, he generated reports with fabricated findings that did not exist or exaggerated findings that may have existed to justify his recommendations for medically unnecessary ESIs; and (3) Dr. Punjwani recommended and

preformed ESIs because they were medically necessary when, in fact, they were recommended and performed to substantially inflate the severity and potential value of the patients' BI and UM Claims and enrich Defendants.  (*See* Dkt. No. 1 at ¶ 74 (identifying additional bases for fraud allegations).)

Third, the Complaint's detailed appendices specify the "time, place, and contents of the false representations."  *Benhamou*, 190 F. Supp. 3d at 642-43; *see also* Dkt. No. 1 at Exs. 1-4. Exhibit 1 identifies and describes each fraudulent Initial Exam Report generated by P.A.I.N. and Dr. Punjwani.  Exhibit 2 identifies and describes each fraudulent MRI Report from Dr. Punjwani. Exhibit 3 identifies and describes each fraudulent Operative Report.   And Exhibit 4 identifies and describes each demand package containing the fraudulent bills and documentation, including the patient's initials, the date of the demand, the charges P.A.I.N. submitted, and the date and amount of the settlement checks mailed by Plaintiffs.   Additionally, the Complaint alleges specific examples of:  (1) an Initial Exam Report that Dr. Punjwani prepared for an examination that did not take place (*id.* ¶ 37); (2) Initial Exam Report findings by Dr. Punjwani that are inconsistent with findings in the patients' contemporaneous chiropractic records (*id* ¶ 43); (3) Initial Exam Reports in which Dr. Punjwani recommended his predetermined ESIs even though the patients did not reveal the indications for the procedure and even had serious conditions for which ESIs would pose significant risks (*id.* ¶¶ 47-48); (4) MRI Reports in which Dr. Punjwani made findings of abnormalities that did not exist on the films or exaggerated the severity of abnormalities that may have existed on the films (*id.* ¶ 52); and (5) Operative Reports that reflect patients experienced no complications when, in fact, the patients testified they experienced significant complications (*id.* ¶ 62).

Courts in this and other districts have repeatedly concluded that complaints with similarly-detailed allegations and appendices satisfy Rule 9(b). *See, e.g.*, *Benhamou*, 190 F. Supp. 3d at 659; *State Farm Mut. Auto. Ins. Co. v. Elite Health Ctrs., Inc.*, No. 16-cv-13040, 2017 WL 877396, at *7 (E.D. Mich. Mar. 6, 2017) (noting similar allegations and charts satisfied particularity requirement for fraud); *State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*, No. 14-cv-11521, 2015 WL 4724829, at *7-9 (E.D. Mich. Aug. 10, 2015) (explaining that similar allegations and charts "put[] defendants on notice of the claims against which they will have to defend"); *State Farm Mut. Auto. Ins. Co. v. Radden*, 2015 WL 631965, at *1 (E.D. Mich. Feb. 13, 2015) (noting allegations and similar chart satisfied particularity requirement for fraud); *State Farm Mut. Auto Ins. Co. v. Universal Health Grp., Inc.*, No. 14-cv-10266, 2014 WL 5427170, at *3 (E.D. Mich. Oct. 24, 2014); (explaining that fraud was alleged with particularity after noting that allegations of the fraud scheme were "coupled with charts demonstrating the types of claim submitted"); *State Farm Mut. Auto. Ins. Co. v. Kugler*, No. 11-cv-80051, 2011 WL 4389915, at *4 (S.D. Fla. Sept. 21, 2011) (collecting cases and noting that "attached claim chart[] describes each allegedly fraudulent claim in detail [and that] . . . [t]hese allegations are sufficient to satisfy the plausibility and particularity requirements of Rule 8(a) and Rule 9(b)").[4]

---

[4] *State Farm Mut. Auto. Ins. Co. v. Advanced Chiropractic and Med. Center Corp.,* No. 18-CV-21127, Dkt. No. 38 at 9-10 (S.D. Fla. Mar. 15, 2019); *Allstate Ins. Co. v. Utica Physical Therapy, Inc.,* No. 17-cv-13823, 2018 WL 3037885, at *4-5 (E.D. Mich. June 19, 2018); *State Farm Mut. Auto. Ins. Co. v. Vital Cmty. Care, P.C.*, No. CV 17-11721, 2018 WL 2194019, at *1 (E.D. Mich. May 14, 2018); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, No. 04-CV-5045, 2008 WL 4146190, at *12 (E.D.N.Y. Sept. 5, 2008); *State Farm Mut. Auto. Ins. Co. v. Lake St. Chiropractic Clinic, P.*A., No. 16-cv-4017, 2017 WL 1014336, at *3 (D. Minn. Mar. 14, 2017); *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 788-89 (E.D. Mich. 2015); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.,* 879 F. Supp. 2d 243, 276 (E.D.N.Y. 2012).

The Complaint's detailed allegations and appendices provide a sharp contrast to the pleading at issue in *Allstate Ins. Co. v. Donovan*, No. CIV.A. H-12-0432, 2012 WL 2577546, at *10 (S.D. Tex. July 3, 2012), the case on which Defendants principally rely.  Indeed, Allstate's initial complaint in *Donovan* did not identify, among other things, (a) "which demand packages sent to plaintiffs contained fraudulent misrepresentations," (b) "which statements within each such document were fraudulent misrepresentations," (c) "when the fraudulent misrepresentations were made," and (d) "when mailings containing fraudulent misrepresentations were made."  *Id.* at *8.  Here, the Complaint includes detailed allegations and appendices that provide this information for each of the records, demands, and settlements at issue.  (*See* Dkt. No. 1 at Exs. 1-4, ¶¶ 36-69.)  Notably, in upholding Allstate's complaint in *Benhamou*, Judge Harmon observed that the *Donovan* court later refused to dismiss Allstate's amended complaint after it added allegations similar to those at issue in *Benhamou* (and this case), namely "patient initials, dates of the predicate acts of mail fraud, etc[.]"  *Benhamou*, 190 F. Supp. 3d at 661.

Defendants' reliance on *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997) is equally misplaced.  (Dkt. No. 14 at 6.)  In *Thompson*, the plaintiff brought claims under the federal False Claims Act, but did not include any allegations specifically explaining why the defendants' services were not medically necessary.  *Thompson*, 125 F.3d at 903.  Instead, the plaintiff merely cited studies concluding that, when providers are engaged in kickbacks and self-referrals, a certain portion of their bills will be for medically unnecessary services.  *Id*.  The court found these allegations insufficient because there were no factual allegations regarding the medical necessity of the specific services at issue and no indication that the studies "implicate[d] defendants."  *Id*.  In contrast to *Thompson*, the allegations of fraud in the Complaint are not based on general statistical studies.  Instead, the

allegations are based on a file-by-file review of the fraudulent bills and supporting documentation created by P.A.I.N. and Dr. Punjwani and submitted to Plaintiffs.

### 2.    The Complaint Adequately Alleges That Dr. Punjwani Intended to Defraud Plaintiffs.

Dr. Punjwani also contends that the Complaint's allegations regarding his fraudulent intent fail to satisfy Rule 9(b).  (Dkt. No. 14 at 9.)  In making this argument, Dr. Punjwani concedes (as he must) that intent can be alleged generally under the plain language of Rule 9(b), but he nevertheless suggests that the Fifth Circuit requires heightened allegations of fraudulent intent.  (*Id*. at 8.)  To show fraudulent intent, it is sufficient to allege "factual allegations that adequately demonstrate defendant had motive and opportunity to commit the fraud and create a reasonable inference of the requisite intent."  *Excel Imaging, P.C.*, 879 F. Supp. 2d at 276 (concluding that insurer alleged medical providers intended to submit fraudulent medical records and bills); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 373 (E.D.N.Y. 2012) (concluding that insurer alleged fraudulent intent by alleging that defendants gained money through their fraud); *see also Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015) (reiterating that plaintiff provided evidence of defendants fraudulent intent through circumstantial evidence, namely their direct participation in the fraud scheme).

Knowledge in this case can be inferred by Dr. Punjwani's consistent and continuous fraudulent actions over a substantial period of time, his financial motives to knowingly commit the fraud, and the circumstances surrounding each step of the scheme.  As described above, the Complaint details Dr. Punjwani's central role in the scheme.  He serves as the primary treating provider at P.A.I.N., personally provides the recommendations for medically unnecessary spinal injections and performs the vast majority of those injections, and then generates the fraudulent bills and supporting documentation at issue.  The Complaint also alleges that Dr. Punjwani was

paid based on the number of injections he provided, and thus he had a personal financial incentive to recommend and perform the injections.  (Dkt. No. 1 at ¶ 54.)  These allegations are more than sufficient to demonstrate Dr. Punjwani's fraudulent intent.  *See Benhamou*, 190 F. Supp. 3d at 659.

Dr. Punjwani's reliance on *United States v. Plato*, 593 F. App'x 364, 371 (5th Cir. 2015) is misplaced.  As an initial matter, the Fifth Circuit in *Plato* only addressed whether the government had presented sufficient evidence to support a criminal conviction under the criminal RICO statute; it did not address the allegations necessary to sustain a civil RICO claim at the pleading stage.  *Id*.  Moreover, *Plato* held that evidence showing that the defendant was "directly responsible as the drafter" of false statements was sufficient to prove fraudulent intent at trial. *Id*.  Here, as in *Plato*, Plaintiffs have alleged that Dr. Punjwani is directly responsible for the creation of the false medical records that are essential to perpetrating the fraud scheme.

**B.      The Complaint Alleges Violations of the Mail Fraud Statute and a Valid RICO Enterprise.**

Dr. Punjwani's Motion takes issue with two elements of Plaintiffs' RICO claim.  First, he appears to suggest that Plaintiffs have not alleged any violations of the mail fraud statute as predicate acts for their RICO claim because Dr. Punjwani did not personally send false claims through the mail.  (Dkt. No. 14 at 7.)   Second, Dr. Punjwani argues that the Complaint fails to allege an "association-in-fact" RICO enterprise.  (*Id.* at 9.)  These arguments are premised on a misreading of Plaintiffs' Complaint and a misunderstanding of black-letter RICO law. [5]

---

[5] "A claim for civil RICO under §1962(c) must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993). Additionally, a plaintiff must allege that it suffered injury to its business or property "by reason of" the predicate acts. *See* 18 U.S.C. § 1964(c). Tellingly, Dr. Punjwani does not contest, and thus concedes, that Plaintiffs have sufficiently pleaded the other elements of their RICO claim. (*See also* Dkt. No. 1 at ¶¶ 70-76.)

### 1.    The Complaint Alleges Violations of the Mail Fraud Statute.

In his Motion, Dr. Punjwani argues that Plaintiffs have not alleged "racketeering activity via mail fraud," asserting that they have to "sufficiently plead that the use of the mails to seek payment was mail fraud, and thus the claims themselves have to be fraudulent or in furtherance of the fraudulent scheme." (Dkt. No. 14 at 7.)  Dr. Punjwani misunderstands the requirements of RICO claims premised on mail fraud.  A mail fraud violation requires proof of two elements: (1) a scheme to defraud, and (2) any "mailing that is incident to an essential part of the scheme. . . . even if the mailing itself contain[s] no false information."  *See Bridge*, 553 U.S. at 647 (quoting *Schmuck*, 489 U.S. at 713).  Importantly, it is not necessary to allege that the defendant "personally used the mails or wires or even knew of the specific mailings that were made; it is sufficient that a defendant 'causes' the use of the mails or wires."  *See Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390, 399 (E.D.N.Y. 2005).  Moreover, mailings "need not be an essential element of the scheme" to defraud, but are sufficient so long as they are "incident to an essential part of the scheme."  *Schmuck*, 489 U.S. at 713.[6]

As described above (*see* pp. 4-10 *supra*), the Complaint alleges in detail the scheme to defraud.  Specifically, the Complaint details how Dr. Punjwani and P.A.I.N. designed and created fraudulent bills and supporting documentation for the purpose of sending them to PI Attorneys so that the PI Attorneys could, in turn, include them in demand packages for BI and UM Claims.  The PI Attorneys used the fraudulent bills and supporting documentation to demand that Plaintiffs settle the claims at inflated values, often at or near policy limits.  The

---

[6] Defendant cites *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993) to set forth the elements of mail fraud. (Dkt. No. 14 at 7.)  Because the plaintiffs in *Burzynski* alleged that defendants personally sent false statements via U.S. mail, the court did not address whether the mail fraud statute *required* that defendants personally use the mail to further the fraud scheme.  Consistent with *Schmuck*, the Fifth Circuit has instructed that "the defendant need not personally effect the mailing."  *United States v. Traxler*, 764 F.3d 486, 488 (5th Cir. 2014).

fraudulent documentation and bills caused Plaintiffs to make higher settlement offers and ultimately agree to settle claims that otherwise might not have been settled, or pay more to settle these claims than they would have had they known the bills and supporting documentation were fraudulent. Plaintiffs then used the U.S. mails to deliver settlement checks on the paid BI and UM Claims at issue. (Dkt. No. 1 at ¶ 73.) This sequence of events is more than sufficient to allege mail fraud. *See Schmuck*, 489 U.S. at 710 (holding that mail fraud statute applies even in instances where people other than the defendants send the relevant mailings because all that is required is that "use of the mails is a part of the execution of the fraud"); *United States v. Surtain*, 519 F. App'x 266, 286 (5th Cir. 2013) (holding that a letter mailed by an insurer informing the defendant-insured that their policy was defective was sufficient to sustain a mail fraud claim against the defendant because a "would-be insurance scammer must expect that as a normal part of the claims process—or, stated differently, as a 'step in [the] plot'—he will be required to prove his claim's legitimacy").

## 2. The Complaint Alleges a Valid RICO Enterprise.

Dr. Punjwani's other RICO argument is premised on both a misreading of the RICO statute and a misreading of the Complaint. Specifically, Dr. Punjwani argues that Plaintiffs have not sufficiently alleged the existence of an "association-in-fact" enterprise. (Dkt. No. 14 at 9-10.) But RICO does not require a plaintiff to allege an "association-in-fact" enterprise and Plaintiffs have not alleged the existence of one. RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In other words, "a RICO enterprise can be either a legal entity or an association-in-fact." *Benhamou*, 190 F. Supp. 3d at 648; *see also Bonner v. Henderson*, 147 F.3d 457, 459 (5th Cir. 1998). Here, Plaintiffs have alleged that P.A.I.N., a limited liability company and thus a "legal entity," is the RICO

18

enterprise, which is sufficient under RICO. *Benhamou*, 190 F. Supp. 3d at 648; *see also B Choice Ltd. v. Epicentre Dev. Assocs. LLC*, No. 14-2096, 2016 WL 3911123, at *14 (S.D. Tex. May 12, 2016) (concluding that limited liability company was a RICO enterprise).

Likewise, contrary to Dr. Punjwani's assertion, Plaintiffs have alleged that Dr. Punjwani engaged in the P.A.I.N. enterprise's affairs and not merely "ordinary, garden-variety business activities." (*See* Dkt. No. 14 at 10.) Dr. Punjwani principally relies on *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013), to support his misguided argument. In *Walgreen Co.*, the Seventh Circuit ultimately concluded that the principal defendants, Walgreens and Par Pharmaceuticals, did not engage in each other's affairs such that they formed an "association-in-fact" enterprise, but rather they "each [went] about [their] own business." *Id.* at 854-55. *Walgreen Co.* thus has no bearing here because Plaintiffs have not alleged the existence of an "association-in-fact" enterprise consisting of multiple individuals and entities. Instead, they have alleged that P.A.I.N. is a "legal entity" enterprise and Dr. Punjwani is the sole RICO "person" who played the integral role in developing and carrying out the fraud scheme. (Dkt. No. 1 at ¶¶ 71-76); *see Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (RICO liability extends to defendants "who participate in the operation or management of the enterprise itself."); *Pointe Physical Therapy, LLC*, 107 F. Supp. 3d at 786-87 (concluding that health care providers who facilitated the submission of fraudulent insurance claims by creating fraudulent medical records are liable under RICO).

### C. The Complaint States a Claim for Money Had and Received Against All Defendants.

Defendants collectively challenge Plaintiffs' money-had-and-received claim on three grounds. First, all Defendants contend that Plaintiffs have not adequately alleged that the money Plaintiffs paid to settle the BI and UM Claims belongs to Plaintiffs because they have failed to

allege that the bills and supporting documentation are fraudulent.  (Dkt. No. 14 at 12; Dkt. No. 15 at 13.)  Second, all Defendants argue that the claim should be dismissed because Plaintiffs did not make payments directly to Defendants, but rather they received the funds through PI Attorneys.  (Dkt. No. 14 at 11; Dkt. No. 15 at 12.)  Finally, the Roopani Defendants argue that they are immune from liability under the Texas Business Organizations Code.  (Dkt. No. 15 at 10-15.)  As described below, all of Defendants' arguments fail.

To assert a money-had-and-received claim, it is sufficient to allege that the defendant holds money which in equity and good conscience belongs to the plaintiff.  *Ardinger*, 369 S.W.3d at 507.  Importantly, the plaintiff need not prove that the defendant obtained the money through any wrongdoing; "rather, [the claim] looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another." *Id.*; *see also Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Texas*, No. 11-2086, 2012 WL 3028107, at *4 (S.D. Tex. July 24, 2012).  Additionally, a plaintiff need not allege that the payments at issue were made directly to the defendant.  *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 843 (5th Cir. 2004).  Rather, the critical inquiry is whether the defendant possesses money that rightfully belongs to plaintiff.  *Id.*

### 1.    The Complaint Adequately Alleges the Money Paid by Plaintiffs to Settle BI and UM Claims Rightfully Belongs to Plaintiffs.

Defendants first argue that Plaintiffs are not entitled to the return of any funds Defendants received because the Complaint does not sufficiently allege "any fraudulent or medically unnecessary treatment."  (*See* Dkt. No. 15 at 8; *see also* Dkt. No. 14 at 12.)  Putting aside that a showing of wrongdoing is not required to sustain a money-had-and-received claim, *see Ardinger*, 369 S.W.3d at 507, this argument again ignores the detailed Complaint allegations describing the fraud scheme.  As described above, the Complaint's detailed allegations easily satisfy the

heightened pleading requirements in Rule 9(b), providing concrete and specific allegations explaining why the bills and supporting documentation were fraudulent and identifying all of the claims at issue.[7]  (*See* pp. 10-14 *supra.*)  The Complaint further alleges that Dr. Punjwani and P.A.I.N.'s fraudulent documentation and bills were a substantial factor and, in fact, caused Plaintiffs to settle claims that otherwise might not have been settled or pay more to settle these claims than they would have had they known the bills and supporting documentation were fraudulent.[8]  Because these payments were caused by the fraudulent bills and supporting documentation, the portions of the settlement payments that Defendants received in equity and good conscience belong to Plaintiffs.  (Dkt. No. 1 at ¶¶ 78-81.)  As numerous other courts across this jurisdiction and others have found, money paid by an insurer based on fraudulent bills and supporting records is recoverable under a money-had-and-received (or unjust enrichment) claim. *Won Yi*, 2019 WL 2355543, at \*2; *Humble Surgical Hosp.*, 2016 WL 7496743, at \*2; *Mid-Town Surgical Ctr.*., 2012 WL 3028107, at \*3-4.

---

[7] Although Defendants cite no authority for the proposition that money-had-and-received claims must comply with Rule 9(b) (and Plaintiffs are aware of none), the allegations of fraud underlying that claim nevertheless satisfy Rule 9(b) pleading requirements.

[8] In their Motions, Defendants suggest that Plaintiffs have admitted they "voluntarily paid" all of the settlements at issue and that they have alleged only "buyer's remorse."  (Dkt. No. 14 at 3; Dkt. No. 15 at 1.)  This appears to be a misguided effort to invoke Texas's "voluntary payment doctrine" at the pleading stage.  *See TCI Cablevision of Dallas, Inc. v. Owens*, 8 S.W.3d 837, 844 (Tex. Ct. App. 2000) (The voluntary payment doctrine provides that "money voluntarily paid with full knowledge of all the facts and without fraud, deception, duress or coercion cannot be received back although it was paid upon a void or illegal demand or upon a claim which had no foundation in fact and was paid without consideration.").  Even if the doctrine had some applicability here – and it does not - Defendants' suggestion that the Complaint should be dismissed because Plaintiffs should have discovered the fraud earlier "is like a burglar saying that it is not liable for stealing from a house because the owners could have locked the door. Being slow to catch a pen-and-paper bandit is not waiver, consent, gift, or entitlement."  *Aetna Life Ins. Co. v. Won Yi*, No. CV H-14-900, 2019 WL 2355543, at \*3 (S.D. Tex. June 3, 2019) (concluding that the voluntary payment doctrine was not applicable where defendants submitted fraudulent bills and supporting documentation); *Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*, No. CV H-12-1206, 2016 WL 7496743, at \*3 (S.D. Tex. Dec. 31, 2016) (same).

### 2. The Complaint Adequately Alleges That Defendants Received Money That in Equity and Good Conscience Belongs to Plaintiffs.

Defendants next contend that, even if P.A.I.N. and Dr. Punjwani received funds as a result of fraudulent conduct, there would still be no liability under the money-had-and-received claim because Plaintiffs did not make any direct payments to Defendants. (*See* Dkt. No. 15 at 7.) Tellingly, Defendants do not cite any authority requiring direct payments from a plaintiff to a defendant to state a claim for money had and received.  That is because courts have consistently held that a defendant need not receive the funds directly from the aggrieved plaintiff.  *See Bank of Saipan*, 380 F.3d at 843 (allowing plaintiff to proceed with a money had and received claim against an entity that had received proceeds from a third party); *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 309-CV-572, 2009 WL 5173954, at *6 (N.D. Tex. Dec. 31, 2009) (concluding that plaintiff adequately stated a claim for money had and received by alleging that defendant was paid money from "fraudulently obtained funds"); *Tri-State Chemicals, Inc. v. W. Organics, Inc.*, 83 S.W.3d 189, 195 (Tex. Ct. App. 2002) (explaining that Texas permits a claim for money had and received against a defendant who received money from the direct recipient).

The rule advanced by Defendants would be contrary to the purpose of a claim for money had and received (akin to unjust enrichment claims in other jurisdictions), which is to provide a remedy for situations where a party wrongfully possesses money that belongs to another.  *See Elite*, 2017 WL 2351744, at *8 (refusing to dismiss unjust enrichment claim under Michigan law against radiologist because allegations permitted Court to infer that he "benefitted at the expense of State Farm," (*i.e.*, Defendant provided fraudulent reports for unnecessary MRIs, State Farm relied on the fraudulent information, and Defendant was paid money based on fraudulent reports)); *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 F. App'x. 714,

722-23 (11th Cir. 2011) (affirming judgment for unjust enrichment against defendants because of their involvement in medical practices that submitted fraudulent claims to State Farm).

The Court's decision in *Kugler* is instructive on this point.  In *Kugler*, State Farm Mutual asserted a claim for unjust enrichment to recover money it was induced to pay to settle BI and UM Claims on the basis of fraudulent bills and documentation.  *Kugler*, 2011 WL 4389915, at *1-2.  The claim was brought against the medical practices that submitted the bills, as well as the physicians who provided fraudulent services.  *Id*.  Defendants sought dismissal on the basis that the complaint did not allege they received any payments directly.  *Id.* at *12.  The court rejected their argument, explaining that "[w]hile State Farm may not have disbursed the $13 million paid on allegedly fraudulent PIP, UM and BI claims directly to the medical defendants, it is reasonable to infer that the defendants benefitted from the fraudulent scheme alleged in the complaint when the patient's attorney collected first and third party settlement monies from State Farm and disbursed the proceeds directly to all medical lienors on the patient's behalf."  *Id.*

Finally, Defendants' suggestion that it is not plausible that they received payments from PI Attorneys – or that the link between them and the PI Attorneys is too attenuated – strains credulity, but in any event, it is outside the four corners of the Complaint.   As alleged in the Complaint, Dr. Punjwani and P.A.I.N. created the fraudulent bills and supporting documentation for the purpose of providing these documents to PI Attorneys, so that the PI Attorneys could submit these materials to Plaintiffs to inflate the value of claims and receive payments from the settlement proceeds.  In fact, P.A.I.N.'s business model is to provide services to auto accident victims with the expectation that it would be paid from settlement proceeds.  Additionally, the Complaint alleges that "Dr. Punjwani has a significant financial incentive to prescribe and perform injections on P.A.I.N. patients because he is paid a fixed fee per injection."  (Dkt. No. 1

at ¶ 54.)  The Complaint further alleges that PI Attorneys provided Defendants a portion of the proceeds obtained from the settlements at issue in this case.  (*Id.* ¶ 63.)  In other words, the Complaint alleges that Defendants were the intended and actual beneficiaries of a fraud scheme.[9]

In light of these facts, Plaintiffs' allegation that Defendants received proceeds from settlements that were induced by Dr. Punjwani and P.A.I.N.'s fraudulent bills and supporting documentation is not only plausible but is a near certainty.  Given that P.A.I.N.'s business model (and its revenue stream) relies on payments from insurance settlements for patients in auto accidents, it is highly likely that it received portions of settlements where its bills and supporting documentation were included in the demand packages submitted to Plaintiffs.  Given Dr. Punjwani's central role in the fraud scheme and the fact that he was paid for providing the fraudulent services at issue, it is highly likely that a portion of those proceeds filtered down to him.  And given that P.A.I.N. is wholly owned by the Roopani Defendants, it is certainly plausible that they received portions of the settlements as well in the form of profits.[10]

---

[9] P.A.I.N. and the Roopani Defendants cite three cases for the proposition that Plaintiffs must allege precisely how the funds flowed to each individual Defendant. (Dkt. No. 15 at 7-8.)  The cited cases do not support that proposition and they are otherwise inapposite.  In fact, in one of the cases cited, plaintiffs' counsel conceded during oral argument that they "have no cognizable claim for money had and received."  *Adams v. Nissan N. Am., Inc.*, No. 4:17-CV-2653, 2018 WL 2338871, at *10 (S.D. Tex. May 4, 2018).  Defendants reliance on *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App. 2005) is similarly misplaced.  In *Everett*, the court dismissed the claim for money had and received because plaintiffs alleged that they had "[p]rospective loss-of-benefit-of-the-bargain damages and cost-of-replacement damages," which "do not constitute injuries that are recoverable" under a claim for money had and received.  *Everett*, 178 S.W.3d at 860.  Finally, in *Segner v. Sinclair Oil & Gas Co.*, No. 3-11-CV-03606, 2012 WL 12885055, at *21 (N.D. Tex. June 4, 2012), the court concluded the claim was "too attenuated" because the defendants did not receive the funds at issue but allegedly only received the "benefit" of plaintiffs' money when they obtained properties during a bankruptcy proceeding.

[10] As alleged in the Complaint, the Roopani Defendants were the sole members of P.A.I.N. from July 2015 through June 2018, when the entity converted to a PLLC.  (Dkt. No. 1 at ¶ 19.)

24

      3.     **The Roopani Defendants' Reliance on the Texas Business Organizations Code is Misplaced Because the Complaint Alleges They Personally Received Money.**

The Roopani Defendants also argue that they should be dismissed from this case because they cannot be held personally liable for the wrongdoing of P.A.I.N.  (Dkt. No. 15 at 5-6 (citing Tex. Bus. Orgs. Code. Ann 21.223(a)(2)).)   This argument, however, misconstrues the Complaint's allegations and overstates the Code provision they cite.  Plaintiffs are not seeking to hold the Roopani Defendants personally liable for the misconduct of P.A.I.N., nor are they trying to hold them liable for a "contractual obligation" of P.A.I.N.  *See* Tex. Bus. Orgs. Code. Ann 21.223(a)(2).  Instead, Plaintiffs are only seeking to recover money that the Roopani Defendants personally possess but that rightfully belongs to Plaintiffs.  As explained above, the guiding inquiry for a claim for money had and received is whether defendants possess money that rightfully belongs to plaintiffs; no showing of wrongdoing on the part of the defendant is necessary.  *Mid-Town Surgical Ctr.*, 2012 WL 3028107, at *4.  Notably, the Roopani Defendants have provided no authority supporting their proposition that the Texas Business Organizations Code immunizes them for liability based on funds they themselves possess because it may have passed through a limited liability company first.   Indeed, such a rule would provide a substantial windfall to LLC members and other business owners.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss in their entirety.

Dated:  August 9, 2019

By:   /s/  Jared T. Heck

Ross O. Silverman (admitted *pro hac vice*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
P:  (312) 902-5200
F:  (312) 577-8989
ross.silverman@kattenlaw.com

ATTORNEY-IN-CHARGE FOR
PLAINTIFFS

Of Counsel:
Brian Antweil (S.D. Tex. No. 12482)
Emily Rochy (S.D. Tex. No. 1358194)
Katten Muchin Rosenman LLP
1301 McKinney Street, Suite 3000
Houston, TX 77010-3033
(713) 270-3402
brian.antweil@kattenlaw.com
emily.rochy@kattenlaw.com

Jared T. Heck (admitted *pro hac vice*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
jared.heck@kattenlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2019 I electronically filed the foregoing Response with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

By:    /s/ Jared T. Heck
Jared T. Heck (admitted *pro hac vice*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
P:  (312) 902-5200
F:  (312) 577-8989
jared.heck@kattenlaw.com