UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS,<br><br>Plaintiffs,<br><br>v.<br><br>NOORUDDIN S. PUNJWANI, M.D.; PAIN ALLEVIATION & INTERVENTIONAL NEEDS, LLC n/k/a PAIN ALLEVIATION & INTERVENTIONAL NEEDS, PLLC; BARKETALI M. ROOPANI; ANIL B. ROOPANI; and SOHAIL B. ROOPANI,<br><br>Defendants. | Case No. 4:19-CV-01491<br>Hon. Ewing Werlein, Jr. |

### AFFIDAVIT OF ABID SATTANI

**STATE OF TEXAS** )
                             ) ss.
**COUNTY OF HARRIS** )

COMES NOW Abid Sattani, being of legal age and first duly sworn upon his oath, and states the following:

1. I am the Chief Operating Officer ("COO") for Elite Health Services – Sugar Land; Medical Center Healthcare Services, L.P. d/b/a Elite Health Services – Medical Center; and Clay Healthcare Services, LLC d/b/a Elite Health Services – West Houston (collectively, the "*Elite Entities*").

2. I have reviewed the subpoenas directed to the Elite Entities and make this affidavit in support of the Elite Entities' response in opposition to Plaintiffs' motion to compel the production of documents responsive to the subpoenas.

Error! Unknown document property name.                                                                **EXHIBIT A**

3. I have personal knowledge of the Elite Entities' records-keeping practices, including patient, financial, and business records.

4. I have personal knowledge and experience with third party computer forensic firms and their roles in the processing, review, and production of materials responsive to requests for documents and data.

5. In addition to my role as COO, I am partially responsible for ensuring the privacy and security of patient medical records and Protected Health Information (PHI) in the possession, custody, and control of the Elite Entities. This responsibility includes ensuring that the Elite Entities comply with the Health Insurance Portability and Accountability Act (HIPAA) as amended, as well as other federal, state, and local laws respecting the confidentiality of patient medical records and PHI.

6. As health care providers, the Elite Entities are "covered entities" as defined by HIPAA, and thus are subject to HIPAA's privacy and security requirements.

7. Complying with the subpoenas served on the Elite Entities would be a highly burdensome and expensive task.

8. For example, to avoid violating HIPAA, the Elite Entities would need to incur the expense of identifying and segregating any non-responsive communications containing PHI and either redact or withhold such communications. Additionally, the Elite Entities would need to pay their attorneys to identify and log each piece of PHI withheld.

9. Plaintiffs' Request 1 calls for "All Documents and Communications related to all patients identified in Exhibit A, including but not limited to all their MRI films, complete medical records, test results, notes, bills, referrals for treatment, consultations, testing, sign-in sheets, prescriptions, orders, and any other documentation."

10. On October 20th, prior to the filing of Plaintiffs' Motion to Compel the Elite Entities to Produce Documents Responsive to Subpoenas, the Elite Entities agreed through counsel to produce all responsive MRI films for inspection at a time convenient for Plaintiffs. (See Exhibit B to the Elite Entities' Response in Opposition to Plaintiffs' Motion to Compel.)

11. Plaintiffs have not responded to or conferred regarding the Elite Entities' offer other than to proclaim it "insufficient" in a footnote to their motion.

12. I estimate it will cost the Elite Entities in excess of $7,500 to have an IT employee present to assist with access to the MRI films and an attorney representative present for 1-2 days to monitor Plaintiffs' access on behalf of the Elite Entities during the inspection.

13. Regarding the remaining items from Request 1, the Elite Entities are not in possession, custody, or control of the "complete medical records" for the 502 patients identified in Exhibit A. These patients have presumably treated at facilities other than the Elite Entities at many points in their lives, so these other facilities would be in possession of at least some portion of these patients' medical records. Even if the Elite Entities could somehow identify every facility at which each of the 502 patients had treated throughout their lives, obtaining such records for production would be exceedingly time-consuming and expensive. Additionally, simply locating and sorting *all* documents and communications even tangentially related to all 502 patients such that documents and communications regarding patients outside the 502 were not included could take multiple Elite Entities staff members and attorneys weeks of painstaking work and would likely require the retention of an outside computer forensics firm to assist in the collection, processing, filtering and production of the Elite Entities' data.

Even if the Court narrowed the scope of Request 1 to the production of "complete medical records" for each patient identified in Exhibit A in the possession, custody, and control of the Elite

Entities, I estimate it would take 2-3 Elite Entities staff members approximately 14 days simply to assemble and produce "complete medical records" for all 502 patients identified in Exhibit A. Further, to locate, identify, sort, review and redact for privilege, review and redact PHI of any patients outside of those identified in Exhibit A, and produce what would amount to thousands of pages of documents, including emails and handwritten notes, I anticipate the cost for such an undertaking would include, at least: (i) continuing to pay these 2-3 staff members their full wages for the 14 day period (if not longer) to assemble and produce "complete medical records" and their wages for the additional days spent in complying with all other requests, while simultaneously losing the staff members' services in connection with their ordinary duties; (ii) the retention of an outside computer forensics firm to assist in the gathering, processing, review, and production of documents and communications responsive to this request and all other requests made to the Elite Entities; (iii) the hosting and storage of all data gathered as part of the retention of an outside computer forensic firm; and (iv) the engagement and retention of attorneys to review all documents and communications for responsiveness, privilege, PHI, and confidentiality.

I am not able to estimate the entire cost for the initial location, processing, and review of all such documents and communications, nor the cost for attorney review, as I don't know the size of the universe of documents and communications that might be identified by a computer forensics firm and do not know how many non-responsive communications would need to be culled from the initial search. Nor can I estimate how much it would cost for the Elite Entities' attorneys to review the documents and ensure the redaction and/or withholding of any privileged, protected, or confidential information.

In short, producing "complete medical records" for all 502 patients identified in Exhibit A, even if limited to those records in the possession, custody, or control of the Elite Entities, would

4

be a highly burdensome and very expensive task that would take Elite Entities staff members away from their regular duties for at least several weeks and have them performing tasks they were neither trained nor staffed to perform. I would also need to take additional significant time away from my regular duties to train and supervise these staff members, oversee the collection and processing of Elite Entities data by the outside computer forensic firm, and act as the liaison between the Elite Entities and the attorneys engaged to review all documents and communications prior to any production.

14. The Elite Entities have an average of five staff members each.

15. The remaining requests, Requests 2-9, similarly seek various "Documents and Communications related to" various aspects of the Elite Entities' business operations and relationships with, for instance, outside radiologists, law firms, patient solicitation firms. The initial stage of locating, identifying, and sorting both electronically-stored and hard copy documents responsive to these requests would look much like the process the Elite Entities would have to go through to produce medical records for the 502 patients identified in Exhibit A. The process would still require weeks of work from a handful of Elite Entities staff members, as well as hiring an outside computer forensics firm. As with Request 1, I would need to train and supervise the staff members and computer forensics firm, taking me away from my regular duties. Again, I do not know the size of the universe of documents that would emerge from this initial stage, but I expect it would comprise many thousands of documents.

As with Request 1, these documents would have to be reviewed and sorted for responsiveness to each request. The Elite Entities' attorneys would then need to review the documents for privilege, PHI, and confidentiality. For instance, documents responsive to Request 6, which seeks documents supporting the amounts the Elite Entities charge for healthcare services

and the costs for providing such services, would contain proprietary, trade secret information that would need to be marked "Confidential." Just like with Request 1, complying with Requests 2-9 would amount to a significant burden to the Elite Entities and their employees, both in time and money.

16. For the reasons stated, I estimate it will cost $7,500 to permit inspection of the MRI films as offered in the October 20th email from the Elite Entities' counsel to Plaintiffs.

17. I further estimate it would cost the Elite Entities approximately $75,000 to $125,000 to substantially comply with the remainder of Request 1 and the remaining Requests 2-9, in addition to the expense that the nonparties have already agreed to incur in producing the MRI images.

Further affiant sayeth naught.

_____
Abid Sattani
Chief Operating Officer for Elite Health Services – Sugar Land; Medical Center Healthcare Services, L.P. d/b/a Elite Health Services – Medical Center; and Clay Healthcare Services, LLC d/b/a Elite Health Services – West Houston

Subscribed and sworn to before me this 10th day of November, 2020.

_____
Notary Public in and for Said County & State

VANESSA V. CASTANON
My Notary ID # 130682206
Expires May 31, 2024

My commission expires:

05-31-2024